Opinion
 

 EPSTEIN, J.
 

 Respondent was arrested by mistake; he was not the person sought under an arrest warrant. He sued those he thought responsible for the mistaken arrest. Trial was protracted, and at its end some of the appellants moved for a directed verdict. Their motion was denied. The verdict was for appellants, but was set aside upon the granting of respondent’s motion for new trial. The motion was granted on proof of juror misconduct. Appellants appeal from that order. One group of appellants argues the trial court should have granted their motion for directed verdict; all appellants argue the court should have denied the motion for new trial. On the first ground, the argument is that respondent’s case presented no basis for liability against appellants. On the second, appellants argue there was no jury misconduct, and if there was, it did not warrant a new trial. We conclude the trial court was compelled to deny the motion for directed verdict, and acted within its discretion in granting the motion for new trial. We therefore affirm that order.
 

 Factual and Procedural Summary
 

 The factual background of the case is principally pertinent to the directed verdict issue, and less so to the motion for new trial. For the latter, it goes
 
 *923
 
 mainly to context and prejudice. A motion for directed verdict is properly granted “ ‘only when, disregarding conflicting evidence and giving to plaintiff’s evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.’ ”
 
 (Estate of Lances
 
 (1932) 216 Cal. 397, 400 [14 P.2d 768].) The following summary of evidence is based on that standard, resolving disputes in and inferences from the evidence in favor of respondent as the party against whom the directed verdict was sought. For the same reason, evidence of contradictions and denials, presented with respect to some of the particulars that follow, is not recounted here.
 

 The respondent, plaintiff below, is James H. Bell. At the time, he was an investigator for the Office of the Los Angeles District Attorney. He was injured, and filed a workers’ compensation claim. He was due to appear in that matter on July 9, 1991.
 

 He left home for the Workers’ Compensation Appeals Board building in Santa Monica at 8 a.m. that morning. He was dressed in a double-breasted suit, white shirt and tie. He arrived in Santa Monica at 8:30 a.m. and parked on the street. He proceeded to the building, walked up a flight of stairs, and eventually found his way to department 7, which he believed to be the assigned hearing room for his case. No one was there when he arrived. He sat down to wait for someone to appear. After a while, a man and woman entered the room and sat at what appeared to be the counsel table. (He later learned that the woman was his attorney in the compensation matter.)
 

 By five to ten minutes after 9 a.m., respondent began to worry that he was in the wrong hearing room. The notice he had received directed him to appear at 8:30 a.m. Still, he continued to wait. After another five minutes, a woman entered the room and asked the man at the table if he knew where the judge could be found. The man pointed toward a rear door. The woman walked in that direction. As she passed respondent she glanced at him, then exited.
 

 Respondent was experienced in waiting in courtrooms, having done it for nearly 20 years. He decided to check the master calendar to see if he was in the correct room. He stood up from his seat, with a portfolio under his left arm, headed for the door, and walked out of the hearing room. He made a right turn in the hall, and was soon brought to a halt.
 

 The woman who had entered the hearing room and inquired about the judge was Michelle Preciado, an investigator for the State Employment
 
 *924
 
 Development Department (EDD). Both she and the agency that employed her were defendants below and appellants here. Ms. Preciado held the rank of senior special investigator for EDD, a position that carried peace officer status.
 

 The day before, July 8,1991, Ms. Preciado had been assigned to supervise execution of an arrest warrant for Darryl Robertson. The warrant was for violation of Unemployment Insurance Code section 2101 (making a false statement to obtain unemployment benefits without entitlement), and called for $5,000 bail. Her information was that Robertson was an African-American with the “persona of a Bryant Gumble.” She was informed that he was a well-dressed man, of athletic build, who carried himself with dignity. He had close-cropped hair, and was expected to be in department 7 of the Workers’ Compensation building in Santa Monica the next morning. She also had information that there had been some sort of altercation involving Robertson in the past, and that the EDD thought he was evading service.
 

 Ms. Preciado had a particularly useful document with which to identify Robertson: a Soundex transmittal from the Department of Motor Vehicles. The Soundex consisted of a photograph of Robertson, his birthdate (January 2, 1960, making him 31 years old at the time), and other descriptive information.
 

 Following instructions, Ms. Preciado made arrangements with the Santa Monica Police Department to participate in the arrest. She did so because, although EDD investigators are peace officers, they are not armed and depend on local police to handle arrests.
 

 In response to her request, two officers of the Santa Monica Police Department met with Ms. Preciado in a parking lot near the workers’ compensation building on the morning of July 9. They were Sergeant Willard Kemp and Officer David Enriquez. Ms. Preciado appeared with another EDD investigator, Rex Cowart. The plan was that she would identify the suspect to be arrested and the Santa Monica officers would make the arrest. Ms. Preciado was to talk to the judge and see if he would allow Robertson to be arrested in the hearing room.
 

 The four officers went to the area outside department 7. Investigator Preciado looked inside the department 7 hearing room and saw a man seated there, well dressed and of athletic build, holding a portfolio. She went into the hearing room. She did not ascertain whether Darryl Robertson had checked in for his hearing. Exiting the room she said, “He’s in the room there.” Looking through the window of the door to department 7, Sergeant
 
 *925
 
 Kemp saw respondent stand up and start to leave. She informed the others of that fact.
 

 Respondent emerged from the hearing room and walked past investigator Cowart and Officer Enriquez.- Investigator Preciado declared, “That was him,” or “That’s him.” At that point respondent was suddenly grabbed from behind. Both arms were seized, one by Sergeant Kemp and the other by Officer Enriquez. Respondent’s wrists were held behind his back up to his neck, forcing him to bend over at 90 degrees and to stand forward on his toes. The folder fell from his arm and spilled on the floor. At the same time he heard one of the officers say, “Hold it, fella. Freeze right there.” Respondent asked “What are you guys doing?” He was told that they had a warrant to arrest him for a felony.
 

 Respondent said they had made a mistake, that his name was James Bell and that, he was a district attorney investigator. He also protested that the grip was hurting him. The response from Sergeant Kemp was, “Yeah, and I’m Mickey Mouse.” Respondent continued to protest the pain he was in. After a time he heard a pop in his shoulder, indicating dislocation of a joint. He repeated that he was a district attorney investigator. Sergeant Kemp asked for his badge and identification. Respondent said they were in the trunk of his car, but that he had a driver’s license in his wallet, which was in the pocket of the coat he was wearing. Sergeant Kemp indicated that he did not want to see it, but that he wanted respondent to get his badge and investigator identification.
 

 Sergeant Kemp told Officer Enriquez they would take respondent to his car. They did so, forcing him to walk with his wrists still held behind his back at the level of his neck, requiring him to remain bent over as he walked down the stairs and out of the building. As the officers proceeded to take him down the hall, respondent saw investigator Cowart putting papers back inside the folder that had fallen from respondent’s arm.
 

 It took one to two minutes to get down the stairs; he stumbled ón the way. It was a slow, painful process. Reaching the outside, respondent was asked for the location of his car; he answered, and the five of them—Sergeant Kemp, Officer Enriquez, and EDD investigators Preciado and Cowart, together with respondent, proceeded in that direction.
 

 When they reached the car Sergeant Kemp asked where respondent had the keys; he said they were in his pocket. Sergeant Kemp retrieved the keys and opened the trunk of the car. During all of this time, respondent was held in the same restraint as before. He was under arrest.
 

 
 *926
 
 Inside the trunk, Sergeant Kemp found the badge and identification, together with respondent’s service revolver. Sergeant Kemp looked up and said, “I guess we owe you an apology.” The grip was released, and everyone but respondent began to laugh. Respondent asked whom they were looking for and why they had arrested him. Investigator Preciado held the Soundex up to Sergeant Kemp, and respondent looked over the sergeant’s shoulder. He responded that “ ‘No way does this person look like me’ and that everyone needed to do a better job.” Investigator Preciado grabbed the Soundex back, and the four officers started to walk away.
 

 Respondent remained at his car, in pain. He was there for 10 to 15 minutes, during which time Sergeant Kemp and Officer Enriquez left after talking to investigators Preciado and Cowart down the street. Respondent picked up his folder from the curb, where it had been left. He noticed that investigators Preciado and Cowart had returned to the workers’ compensation building, and he went back the same way he had exited. Citizens came up to him, asking what happened. Many persons approached and gave him identification so that he could contact them later.
 

 He found investigators Preciado and Cowart outside the department 7 hearing room. He asked investigator Preciado what agency she was with and who she was. There was no response. He then asked her for identification, and again received no response. He also asked for a business card. At that point, investigator Preciado obtained a card from investigator Cowart and gave it to respondent. She said, “ ‘Do you have a problem with what happened—with what happened up here this morning, Buddy?’ ” Respondent said that he had a real problem about it. He asked investigator Preciado if her name was on the card; she took it back and wrote another name and told respondent, “ ‘If you have a problem with what happened up here, you can call my supervisor.’ ”
 

 Respondent asked why she pointed him out as the suspect. Her answer summed up the problem: “ ‘Well, you were the only Black guy up in Department 7, and you fit the description.’ ”
 

 Appellant was the only African-American in the room, but, apart from his race, he did not fit the description. He was bom in 1948, and so was 43, 12 years older than the suspect Robertson. Investigator Preciado testified that, comparing the Soundex to appellant, and as a trained investigator, she could tell that appellant was not the person sought; she could see that a mistake had been made. Unfortunately, no one made that comparison at the scene.
 

 Respondent sued the City of Santa Monica and the State of California, together with the officers named in the foregoing account. The second
 
 *927
 
 amended complaint, the charging pleading, contained five causes of action: negligence, assault and battery, intentional infliction of emotional distress, slander per se, and false imprisonment. At trial, appellants moved for nonsuit (after respondent’s opening statement and again after his case-in-chief), and the state defendants moved for a directed verdict after all evidence in the case had been presented. Nonsuit was granted on the defamation cause of action, and no issue is made of that on appeal. It was denied on all other grounds. The motion for directed verdict also was denied. After a 20-day trial and 9 days of jury deliberation, the jury returned a verdict in favor of appellants.
 

 Respondent moved for a new trial and, in the alternative, for judgment notwithstanding the verdict. The latter was denied, and the former granted on the ground of juror misconduct. (The motion was denied on the other grounds presented.) The trial court stated its reasons for granting the new trial motion in a thorough 10-page order. Timely notices of appeal were filed.
 

 Discussion
 

 I
 

 The state appellants (but not the city appellants) argue that the trial court erred in denying their motion for a directed verdict. Long recognized as a remedy at common law, this “demurrer to the evidence” is now codified in Code of Civil Procedure section 630. Respondent does not challenge the cognizability of a challenge to an order denying the motion on an appeal from a subsequent order granting new trial. We agree with that tacit conclusion. (See
 
 Hilliard
 
 v.
 
 A.H. Robins Co.
 
 (1983) 148 Cal.App.3d 374, 384 [196 Cal.Rptr. 117].)
 

 As we have noted already, the motion must be denied if the plaintiff presents any substantial basis that justifies submission of its case to the jury. All inferences and intendments are resolved in favor of denial. In this, the scope of the trial court’s review, and ours, is much like appellate review on a claim of insubstantial evidence. (See generally, 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, §§ 431, 432, pp. 492, 493.)
 

 The state appellants argue that the cause of action for false arrest should have been dismissed because there was no arrest, but only a detention. They are mistaken. If the facts in this case do not demonstrate an arrest, it is difficult to imagine what could. First and foremost, appellants acted under a warrant for
 
 arrest,
 
 and in seizing respondent, Sergeant Kemp told
 
 *928
 
 him that he was
 
 under arrest
 
 pursuant to a felony warrant for his
 
 arrest.
 
 He obviously was not free to leave, and he was held in close physical restraint until, to their surprise, the officers discovered that he was who he said he was, which was someone other than the person the warrant commanded the officers to arrest. The state appellants also argue that, if there was an arrest, it was performed by the city appellants. But it was accomplished by a team consisting of two peace officers from each agency, under the overall supervision of state investigator Preciado. The same response applies to the state’s effort to shift all responsibility for any assault and battery to the city appellants.
 

 The state appellants argue, correctly, that imprisonment based on a lawful arrest is not false and is not actionable in tort. They assert that this principle applies because they were acting in good faith in causing respondent’s arrest. There is substantial evidence to the contrary. They had a picture of the person they were after, and it manifestly did not match respondent. Respondent immediately protested that they had made a mistake, and stated his actual identity. Instead of matching his appearance to the Soundex, or accepting his invitation to check the driver’s license in the wallet on his person, or the papers he had been carrying but which had been knocked out of his hand, they simply allowed the arrest to proceed as respondent was forced to his car.
 

 More significant is the careless manner in which respondent had been identified in the first place. Investigator Preciado had the Soundex, saw respondent in the hearing room, had no information that Darryl Robertson had checked in, yet told the others that the person in the room—respondent—was their man.
 

 She later justified her action by saying that he was the only Black person in the room and he matched the description. Insofar as he was the only African-American there, was well dressed, and bore himself with dignity, the statement is true. If that were enough to justify an arrest in this case, the constitutional and other safeguards that protect citizens from baseless arrest would mean little or nothing. It is not. There is ample evidence that the state appellants lacked a
 
 reasonable
 
 basis to conclude that respondent was the man they sought.
 

 The state appellants also argue that respondent’s evidence is not enough to establish the tort of intentional infliction of emotional distress. Respondent does not challenge that argument in his brief, and we may deem it abandoned for purposes of this appeal. (See
 
 Osborn
 
 v.
 
 Irwin Memorial Blood Bank
 
 (1992) 5 Cal.App.4th 234, 258, fn. 3 [7 Cal.Rptr.2d 101];
 
 Berger
 
 v.
 
 Godden
 
 (1985) 163 Cal.App.3d 1113, 1119 [210 Cal.Rptr. 109].)
 

 
 *929
 
 Finally, the state appellants argue they are immune. They cite a plethora of statutes: Civil Code section 43.55 (immunity to peace officer in making arrest pursuant to warrant if he or she acts in reasonable belief the person arrested is the one referred to in the warrant); Penal Code section 836, subdivision (a)(2) (warrant arrest proper if officer has reasonable cause to believe the person arrested committed a felony); Civil Code section 847 (no false imprisonment liability when there is reasonable cause to believe arrest was lawful); Government Code section 820.4 (no liability where public employee acts with due care in execution or enforcement of any law); Government Code section 820.2 (immunity for discretionary acts); and Government Code section 821.6 (no liability for instituting prosecution).
 

 All but the final two citations in this series require reasonable conduct on the part of the public employees involved. As we have discussed, the record in this case is ample to justify a jury decision that the acts of the state appellants in causing respondent’s arrest were unreasonable.
 

 Neither do their tactics in doing so do fall within the ambit of discretionary act immunity. That rule requires proof that the specific conduct that gave rise to the suit involved an actual exercise of discretion—a conscious balancing of risks and advantages; the term is limited to “basic policy decisions.”
 
 (Johnson
 
 v.
 
 State of California
 
 (1968) 69 Cal.2d 782, 793 [73 Cal.Rptr. 240, 447 P.2d 352];
 
 Caldwell
 
 v.
 
 Montoya
 
 (1995) 10 Cal.4th 972, 979 [42 Cal.Rptr.2d 842, 897 P.2d 1320];
 
 Zuniga
 
 v.
 
 Housing Authority
 
 (1995) 41 Cal.App.4th 82, 97 [48 Cal.Rptr.2d 353].) Neither state defendant exercised that level of discretion in this case.
 

 Finally, neither of the state investigators had anything to do with initiating a prosecution, nor were they investigating anything. They were simply seeing to the execution of a warrant. Government Code section 821.6 has nothing to do with the case.
 

 It follows that the motion for a directed verdict was properly denied, as were the nonsuit motions that preceded it. We proceed to examine the issue of new trial based on juror misconduct.
 

 II
 

 The authority of a trial court to grant a new trial after a jury verdict or court decision is prescribed by statute. Code of Civil Procedure section 657, subdivision 2 allows that remedy for misconduct of the jury. The provision is subject to the basic rule, stated in the initial paragraph of the statute, that the cause materially affect the substantial rights of the moving party.
 

 
 *930
 
 Experiments by the jury or a juror and unauthorized conversations about the case, outside the ambit of deliberations, may constitute misconduct sufficient to warrant a new trial. Respondent presented three declarations from jurors in support of his new trial motion.
 

 Juror B.F. declared (among other things) that Juror R. said that he had suffered the same shoulder surgery that had been performed on respondent, and had recovered without suffering the complications claimed by respondent. The more important part of this juror’s declaration is that: “During the deliberations Juror [B.] advised all the other jurors that she and some other person, not a member of the jury, had attempted to recreate the sequence of events when Plaintiff’s arms were placed up behind his back. She claimed that she fell over when she tried to do it. Based on this out of court recreation
 
 [sic:
 
 reenactment] of events she expressed her disbelief in the Plaintiff’s testimony on this point and therefore as to his entire testimony.”
 

 Juror J. R. gave a declaration stating that Juror R. had told the other jurors that he was an expert and had had the same shoulder injury as respondent, and made a good recovery without the symptoms described by respondent. Other jurors expressed confidence in Juror R.’s medical opinion. Juror R. also claimed expertise on law enforcement investigations, and expressed his view that the investigation in this case was properly done. Juror J. R. also declared that, on at least six occasions, several jurors made an issue of the fact that respondent’s wife did not testify on his behalf.
 

 Juror J. R. also reported on Juror B.’s experiment in the same terms as had Juror B. F.
 

 Juror McM., in her declaration, substantially repeated the statements of Jurors B. F. and J. R. about Juror R.’s claims and Juror B.’s out-of-court experiment.
 

 Appellants presented five juror declarations. They were principally addressed to statements on other matters in the three declarations presented by respondent, although Juror R.’s statements and the fact that respondent’s wife did not testify were mentioned. The last of the five declarations is by Juror R. He denied using the experience of his own shoulder injury as a basis for his decision, expressing any medical opinion or suggesting that his injury was the same as that of respondent, or claiming to be an expert on anything. None of the declarations rebutted, or even mentioned, the statements in respondent’s declarations about Juror B.’s experiments or her communication of those experiments and the results to the other jurors.
 

 The standard for review of an order granting a new trial is abuse of discretion, and juror misconduct is an area in which the broad discretion is
 
 *931
 
 accorded to the trial judge. (8 Witkin, Cal. Procedure,
 
 supra,
 
 Attack on Judgment in Trial Court, § 139, p. 640.) Witkin distills the law on the point: “The trial judge is familiar with the evidence, witnesses and proceedings, and is therefore in the best position to determine whether, in view of all the circumstances, justice demands a retrial. Where error or some other ground is established, his discretion in granting a new trial is seldom reversed. The presumptions on appeal are in favor of the order, and the appellate court does not independently redetermine the question whether an error was prejudicial, or some other ground was compelling. Review is limited to the inquiry whether there was any support for the trial judge’s ruling, and the order will be reversed only on a strong affirmative showing of abuse of discretion.” (8 Witkin,
 
 supra,
 
 § 143, p. 644.)
 

 There is an abundance of reported decisions concerning jury experiments. The classic rule was stated by our Supreme Court early in this century: “They [the jurors] may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.”
 
 (Higgins
 
 v.
 
 L. A. Gas & Electric Co.
 
 (1911) 159 Cal. 651, 657 [115 P. 313].)
 

 People
 
 v.
 
 Conkling
 
 (1896) 111 Cal. 616, 627 [44 P. 314] is a classic case. It appeared that, during the trial, two jurors borrowed a rifle similar to the one by which the deceased had been killed, and experimented by firing the rifle to determine the distance that powder marks would be carried by the fire, an issue in the case. The Supreme Court reversed the ensuing conviction. It said the experimenting jurors were too zealous, and their misconduct required retrial. “Jurors cannot be permitted to investigate the case outside the courtroom. They must decide the guilt or the innocence of the defendant upon the evidence introduced at the trial. It is impossible for this court to say that this outside investigation did not affect the result as to the character of the verdict rendered. For, when misconduct of jurors is shown, it is presumed to be injurious to defendant, unless the contrary appears.” (111 Cal. at p. 628.)
 

 People
 
 v.
 
 Castro
 
 (1986) 184 Cal.App.3d 849 [229 Cal.Rptr. 280] is remarkably similar to the case before us. The ability to perceive through binoculars was an issue in the case. One of the jurors “ ‘went home and used binoculars to see if a witness could have possibly seen what he [the witness] said he did.’ ” (184 Cal.App.3d at p. 852.) This was misconduct, giving rise to a presumption of prejudice that was not rebutted.
 
 (Id.
 
 at pp. 855-856.)
 

 
 *932
 
 What jurors
 
 can
 
 do, as a body during deliberations, is engage in experiments which amount to no more than a careful evaluation of the evidence which was presented at trial.
 
 (People
 
 v.
 
 Cooper
 
 (1979) 95 Cal.App.3d 844, 853 [157 Cal.Rptr. 348];
 
 People
 
 v.
 
 Bogle
 
 (1995) 41 Cal.App.4th 770, 778 [48 Cal.Rptr.2d 739].)
 

 In this case, the jury had been instructed, in terms of BAJI No. 1.00.5, not to conduct experiments. The trial court would not have allowed a courtroom experiment depicting the manner in which respondent’s hands and arms had been pinned behind his back. The reason was concern that doing so could cause injury. Given that, the experiment by Juror B. was not “within the lines of offered evidence.”
 

 In ruling on the new trial motion, the trial court effectively applied the three-step inquiry outlined in
 
 People
 
 v.
 
 Dorsey
 
 (1995) 34 Cal.App.4th 694, 703 [40 Cal.Rptr.2d 384]: Determine whether the affidavits supporting the motion are admissible, whether the facts establish misconduct, and whether the misconduct is prejudicial. The trial court expressly excluded inadmissible portions of the declarations, such as passages addressed to the mental processes of the jurors. We shall allow the trial judge to explain the application of the other two factors in her own words:
 

 “In this case, the affidavits presented by the Plaintiff informed the Court that one juror conducted an experiment attempting to replicate the manner by which the plaintiff was allegedly seized by Defendant Santa Monica Police Officers. The experiment was done outside of court with unknown third parties assisting, and the results were related to the jury during deliberations. The jury was advised that the juror ‘fell over when she tried to do it’.
 

 “The incident the juror was attempting to replicate is not subject to experimentation because of the inability to accurately duplicate critical factors such as the size, strength and height of the individuals, the amount of force involved, and the specific or unusual physical characteristic of each individual involved. Further, experimentation is inappropriate due to the fact that, if the acts were carried out in exact fashion described by the Plaintiff, the party acted upon could easily be injured. The court would not have allowed a recreation of the actual hold in court and frequently had to admonish counsel in the presence of the jury to refrain from illustrating a purported posture to the jury during their various examinations and/or cross examinations.
 

 “This ‘experiment’ was juror misconduct on several grounds: first, the juror was obviously discussing the case outside the court with other persons
 
 *933
 
 in violation of the direct order of the court; second, the juror attempted to simulate the events at the scene; and, third, the fact of the experiment and its results were passed onto the other jurors.
 

 “The juror’s experimental results contradicted the testimony of the Plaintiff and was consistent with the position urged by the Defendants in the trial. The action was clearly misconduct. The jury’s assessment of the credibility of the witnesses was obviously paramount in the evaluation of the case. The jury’s evaluation of the method by which Officers Enriquez and Kemp apprehended Mr. Bell was a critical, if not the key, factual determination[] in the outcome of this litigation. Had Plaintiff’s version of these facts been believed, there would have been a breach of duty as a matter of law. The only questions remaining for the jury would have been whether this breach of duty was a cause of injury or damage to the Plaintiff and the amount of such damages, if any. In this trial, with the crucial nature of the credibility analysis, the actions of this juror were prejudicial to Plaintiff’s right to a fair trial.
 

 “The defendant offered no evidence to rebut the prejudice. The affidavit of the jury foreman affirms that the jury was told that the particular juror ‘tried to bring her arm up to the nape of her neck.’ Rather, the defense urges that the jurors experimentation was allowable within the guidelines set forth in
 
 Higgins
 
 v.
 
 L.A. Gas & Electric Co.
 
 [citation]. Those principles allow a jury,
 
 in the deliberation room,
 
 to carry out experiments within the lines of offered evidence. For the reasons stated above, this particular experiment would not have been within the lines of offered evidence even had it been conducted in the jury room with all twelve jurors present. The fact that the experiment was performed by one juror, aided by unknown third parties, outside of the court room and the deliberations, is more egregious and resulted in outside influences or extrinsic evidence permeating the jury’s deliberations on perhaps the key factual determination in the case. I am unable to conclude that no reasonable probability of actual harm to the complaining party occurred.” (Italics in original.)
 

 The parties raise a quibble that the final statement amounts to application of an erroneous standard in ruling on the motion for new trial. Read as a whole, it is clear the court was saying that the presumption of prejudice from the misconduct had not been rebutted.
 

 The trial court also considered the speculative discussion about respondent’s wife not testifying, and some other matters, as indicating that there had been discussion of matters outside the record. We need not review these. The principal, and sufficient, basis for new trial was the juror’s improper
 
 *934
 
 experiment and her report of the result to the other jurors. The trial court was well within its discretion in granting the motion for new trial on that basis.
 

 Disposition
 

 The order granting new trial is affirmed. Respondent to have his costs on appeal.
 

 Vogel (C. S.), P. J., and Hastings, J., concurred.
 

 A petition for a rehearing was denied May 27, 1998, and appellants’ petition for review by the Supreme Court was denied July 29, 1998.