Filed 5/21/13  Tamas v. T.L Pavlich Construction CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOE TAMAS, | B236044 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. PC034177) |
| v. | |
| T.L. PAVLICH CONSTRUCTION, INC., | |
| Defendant and Respondent. | |

---

APPEAL from a judgment of the Superior Court of Los Angeles County, Randy Rhodes, Judge.  Affirmed.

The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Horvitz & Levy, David S. Ettinger, Karen M. Bray; Schaffer, Lax, McNaughton & Chen, Clifford L. Schaffer and Kara A. Pape for Defendant and Respondent.

_____

Joe Tamas was injured when his car collided with a parked motor grader owned by T.L. Pavlich Construction, Inc. After the jury returned a verdict in favor of Pavlich Construction, Tamas moved for a new trial on the ground jurors had engaged in misconduct by using toy cars to reenact the accident. The trial court denied the motion. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Accident*

From 2001 to 2003 Pavlich Construction was a contractor on a Los Angeles Department of Water and Power project to install a 96-inch diameter main water line along Sepulveda Boulevard in the San Fernando Valley. The project required use of several large construction vehicles including a motor grader, which is a piece of excavation equipment with a protruding steel blade.

On December 20, 2002 two of the three southbound traffic lanes on Sepulveda Boulevard had been incorporated into the median to create a work area—known as work area 14—where the accident occurred. The work area was 72 feet wide.[1] At about 5:15 p.m., after construction had been completed for the day, Tamas was driving northbound when he was sideswiped on the passenger side by a car that was trying to avoid a collision with a third car. Tamas swerved and collided with a motor grader parked inside the work area, three feet from the line dividing it from the northbound traffic lane. Tamas sustained several injuries, including broken ribs and a fractured femur, and suffered a heart attack. In March 2004 Tamas filed a first amended complaint asserting various claims including one for negligence against Pavlich Construction.[2]

---

[1]    Tamas and Pavlich Construction sharply disagree whether the width of the permissible work area was all 72 feet or approximately 62 feet as depicted by cross-hatching on certain construction documents. We need not resolve this issue. We merely refer to the entire section of road as the work area for convenience.

[2]    The Department of Water and Power and the City of Los Angeles, which were also named in the first amended complaint, entered into a settlement agreement with Tamas.

2

2. *Summary of the Evidence Presented at Trial*

After the jury in the first trial was unable to reach a verdict, trial before a second jury began in late April 2011. William Beardsley testified he was the traffic engineer retained by Pavlich Construction to design the traffic control plan for the construction project. Beardsley's design was predicated in part on plans prepared by the Department of Water and Power indicating the location of the pipe to be installed and the minimum work area required; specifications from the Los Angeles Department of Transportation as to the number of lanes that should be available for traffic and the size of the work area required; and the California Traffic Manual. The plan for work area 14, which was approved by the Los Angeles Department of Transportation in July 2002, did not require use of concrete barriers, known as K-rails,[3] to separate the traffic lane from the work area.

Javier Corona testified he was a superintendent with Pavlich Construction responsible for overseeing the Sepulveda Boulevard project in December 2002. He instructed employees to park all vehicles and equipment "side-by-side," as close together as possible and at least two feet from the line dividing the traffic lane from the work area—the minimum distanced required by the Department of Transportation—to prevent cars from crossing through the construction site after hours and to increase the visibility of the equipment. Because of this practice, the motor grader could not be parked farther than three feet from the traffic lane on the day of the collision. Corona, who testified inspectors from the Department of Water and Power and Department of Transportation were at the jobsite daily, agreed with the statement in Pavlich Construction's safety manual that equipment had to be stored in a manner to reduce collisions with vehicles that run off the road whenever practical. He further testified Pavlich Construction would have been required to use K-rails to barricade any excavation within five feet of a traffic lane to prevent a car that might veer out of the traffic lane from falling into the excavation.

---

[3] K-rails are about 30 inches tall and two feet wide at the bottom narrowing to six inches at the top.

3

Weston Pringle, a traffic engineer retained by Tamas to testify as an expert witness, opined Pavlich Construction created a dangerous condition by parking the construction equipment side by side so close to a traffic lane. Based in part on guidelines published by the United States Department of Transportation, the California Department of Transportation (Caltrans) and the American Association of State Highway and Transportation Officials, Pringle testified the construction equipment should have been parked in a linear, parallel configuration as close as possible to the center of the median to create a "clear zone" that would allow "an errant vehicle driver [to] recover without hitting anything": "I think the 12 feet that Caltrans referred to would be reasonable. I would like to see even farther. But it seemed to me, based on what the plans show, there was a lot of room there to keep the equipment away from the travel way; so the farther, the better."[4] Alternatively, the motor grader should have been shielded with a K-rail, which is designed to redirect vehicles back onto the roadway with little impact. Pringle conceded, however, Pavlich Construction did not violate any rule, law or ordinance by parking the motor grader only three feet from the traffic lane.

Marc Firestone, an accident reconstruction expert with a Ph.D in physics, testified on behalf of Pavlich Construction that a 52-foot skid mark in the road demonstrated Tamas had been driving in the middle lane—not the lane closest to the work area as he had testified—when he was sideswiped by another car. Tamas's car skidded diagonally at about a 12 degree angle across the lane toward the median and then turned to the left, hitting the motor grader at a combined angle of about 68 degrees. Firestone testified Tamas would not have hit the motor grader if his car had continued skidding in the initial direction. He further testified the damage to Tamas's vehicle would have been the same whether he hit the motor grader or a K-rail because K-rails are designed to deflect

---

[4]   John Squier, a traffic engineer retained by Pavlich Construction, opined the absence of incidents during the 14 months prior to Tamas's accident demonstrated there was no dangerous condition. He also testified the publications Pringle relied on were only guidelines and their application to a particular jobsite depends on numerous factors, including field conditions.

4

vehicles that collide at angles of 20 degrees or less. The president of Pavlich Construction, Tommy Pavlich, testified, if Tamas "hadn't hit the motor grader, he would have probably hit a loader if the motor grader wasn't parked there. Or if nothing was parked there, he would have wound up in a 15, 20 foot ditch."

### 3. *The Verdict*

On Friday, May 13, 2011, the jury began its deliberations. On May 18, 2011 the jury announced it was deadlocked and was instructed with CACI No. 5013 to continue deliberating. After deliberating on May 19, 2011 the jury was excused for a few days so a juror could attend his son's graduation. On May 25, 2011, the day after deliberations had resumed, the jury asked for clarification of special verdict question number 1—was Pavlich Construction negligent? Within minutes of being advised to refer to the jury instruction concerning negligence, the jury reached a 9-3 verdict in favor of Pavlich Construction.

### 4. *The Trial Court's Denial of Tamas's Motion for New Trial*

Tamas moved for a new trial on the grounds the evidence did not support the verdict and the jurors had engaged in misconduct by using toy cars to reenact the accident. An affidavit from juror Kathleen Jacinto stated, "Near the end of our deliberations, when we were still undecided, a juror brought in toy cars and we attempted to reconstruct what happened by moving the cars in different directions and trying to reconstruct where [Tamas's] car would have gone if the motor grader had not been parked where it was at the time of the collision. After we did our testing inside the deliberation room, we took another vote and for the first time, the vote was 9 to 3 for the defense." Affidavits from two other jurors were substantially similar. The court denied the motion without comment on the juror misconduct issue after hearing argument during which the attorneys also did not raise the issue.

5

**DISCUSSION**

1. *Law Governing New Trial Motions Based on Juror Misconduct; Standard of Review*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute." (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.) Code of Civil Procedure section 657 identifies seven grounds for a new trial motion, including jury misconduct. When a party seeks a new trial based on jury misconduct, the court undertakes a three-step inquiry. First, the court must determine whether the declarations offered in support of the motion are admissible under Evidence Code section 1150.[5] If they are, the court must next consider whether the facts establish misconduct. Finally, assuming misconduct is found, the court must determine whether it was prejudicial. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112-113; *People v. Hord* (1993) 15 Cal.App.4th 711, 724.) "Juror misconduct raises a rebuttable presumption of prejudice . . . ." (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

Whether juror misconduct has occurred is "a legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*)). However, we

---

[5] Under Evidence Code section 1150, subdivision (a), only evidence of "'objective facts'" is admissible to prove juror misconduct. (*In re Stankewitz* (1985) 40 Cal.3d 391, 397.) Evidence regarding how such objective facts may have influenced jurors' subjective thought processes is inadmissible to impeach a verdict. (*Ibid.*) "Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . . .'" (*Id.* at p. 398.) "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

6

"'accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*Ibid.*) Similarly, whether misconduct is prejudicial is reviewed independently as a mixed question of law and fact when the trial court denies a motion for new trial. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260-1263.)

### 2. *The Jury Did Not Commit Misconduct by Using Toy Cars To Reenact the Accident*

For more than a century courts have addressed the kinds of experiments jurors may conduct during deliberations: "From the venerable authority of *Higgins* [*v. L.A. Gas & Electric Co.* (1911) 159 Cal. 651] and its progeny, several principles emerge. Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the "'scope and purview of the evidence.'" [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*Collins*, *supra*, 49 Cal.4th at p. 249 [holding juror's use of home computer to make a diagram of relative positions of defendant and victim at time of shooting and demonstration during deliberations how victim may have sustained wound with downward trajectory not misconduct].)

Tamas concedes jurors were permitted to enact physical demonstrations in *Collins*, *supra*, 49 Cal.4th 175 and *People v. Cooper* (1979) 95 Cal.App.3d 844, 853-854 (reenacting demonstration by arresting officer showing how defendant tossed bag of heroin). Relying in large part on *Bell v. State of California* (1998) 63 Cal.App.4th 919 (*Bell*), a decision by our colleagues in Division Four of this court, Tamas attempts to distinguish these cases on the ground the demonstrations involved relatively simple variables that could be re-created and were supported by the physical evidence—the distance between the shooter and the victim; their height and body position—whereas

7

reconstruction of an automobile accident involves the interplay of physical forces that cannot be simulated in the jury room such as the mass, velocity and curving trajectories of the vehicles. *Bell*, however, cannot be reduced to such a simple proposition broadly eliminating a jury's ability to reconstruct an automobile accident using demonstrative aids.

In *Bell* plaintiff James Bell sustained a shoulder injury when his wrists were held behind his back up to his neck, forcing him to bend over at 90 degrees and stand on his toes, during a wrongful arrest. (*Bell v. State of California*, *supra*, 63 Cal.App.4th at p. 925.) During deliberations a juror reported that she and another person (not a juror) "'had attempted to recreate the sequence of events when [Bell's] arms were placed up behind his back. She claimed that she fell over when she tried to do it. Based on this out of court [reenactment] of events she expressed her disbelief in [Bell's] testimony on this point and therefore as to his entire testimony.'" (*Id.* at p. 930.) The trial court, in a decision affirmed on appeal, granted Bell's motion for new trial, finding it was misconduct on several grounds: "'first, the juror was obviously discussing the case outside the court with other persons in violation of the direct order of the court; second, the juror attempted to simulate events at the scene; and, third, the fact of the experiment and its results were passed onto other jurors.'" (*Id.* at pp. 932-933.) With respect to the reenactment itself the trial court in part found, "'The incident the juror was attempting to replicate is not subject to experimentation because of the inability to accurately duplicate critical factors such as the size, strength and height of the individuals, the amount of force involved, and the specific or unusual physical characteristic of each individual involved." (*Id*. at p. 932.)

Unlike *Bell* in which the juror was attempting to realistically duplicate—outside the presence of the other jurors with a person of unknown height and weight—the actual, physical encounter between Bell and police officers to determine if it could have happened the way Bell had testified, here the jurors were not trying to realistically reenact the collision. Rather, as described in juror declarations, they were using the toy

8

cars to "reconstruct what happened by moving the cars in different directions."[6] Given the exceedingly general nature of the juror declarations, it is a reasonable conclusion the jurors were simply creating a visualization of the trial testimony to assist them in determining, among other disputed issues, whether Tamas was driving in the lane closest to the work area, as he had contended, or whether, as Firestone opined, Tamas had been driving in the middle lane when he was sideswiped, skidded diagonally and then made an unwarranted sharp turn to his left, putting him on a collision course with the motor grader that he would not have had absent his own negligence. This sort of reenactment did not require the reliable simulation of difficult physics concepts as Tamas suggests.

Tamas further contends the experiment crossed the line between a permissible visualization of the evidence and an impermissible "new investigation going beyond the evidence admitted" (*Collins*, *supra*, 49 Cal.4th at p. 249) when jurors attempted to determine what would have happened if the motor grader had not been parked where it was because there was insufficient evidence admitted on this "counter-factual scenario." Tamas argues Firestone's testimony was strictly limited to describing how the accident occurred and he never described what might have happened if the motor grader had been parked in a different location. Tamas further argues Tommy Pavlich's spontaneous utterance during cross-examination that Tamas would have hit another piece of equipment or ended up in a ditch if the motor grader were in a different location was simply a hypothesis unsupported by any data.

Tamas's argument is without merit. What would have happened if the motor grader was parked in a different location is essentially the same question as whether the motor grader's location caused Tamas's harm, an essential element of Tamas's case in chief. Indeed, during closing argument Tamas's counsel argued, "What caused the harm is parking a motor grader there that caused the harm, and that's what you have to decide as to the cause of the harm." Although Corona testified he did not recall what was parked

---

6     Juror Lewis similarly declared, "a female juror brought in some toy vehicles and the jurors reconstructed how the accident happened."

next to the motor grader at the time of the accident, Corona had testified all the construction equipment was parked next to each other, side by side; and pictures of the construction site were admitted into evidence. In conjunction with Firestone's testimony as to the angle Tamas's car skidded after being sideswiped, the sharp veer to the left based on the skid mark and the estimated speed of travel, examining the evidence in the "slightly different context" of the absence of the motor grader was "within the '"scope and purview of the evidence.'"" (*Collins*, *supra*, 49 Cal.4th at p. 249.) In sum, based on the spare juror declarations as to the use of the toy cars, Tamas has failed to carry his burden of establishing juror misconduct. (See *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.)

## DISPOSITION

The judgment is affirmed. Pavlich Construction is to recover its costs on appeal.


PERLUSS, P. J.

We concur:


ZELON, J.


JACKSON, J.

10