Filed 10/30/14  P. v. Bryan CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048482 |
| v. | (Super. Ct. No. 09NF3570) |
| DEREK JACOB BRYAN, | O P I N I O N |
| Defendant and Bryan. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Junichi P. Semitsu, Lise Jacobson and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted defendant Derek Jacob Bryan of attempted murder (Pen. Code, §§ 187, 664; all statutory citations are to the Penal Code unless noted), and found he personally inflicted great bodily injury (§ 12022.7, subd. (a)). Bryan contends the jury committed prejudicial misconduct during deliberations by attempting to reenact Bryan's version of the stabbing, using a pen as the knife allegedly wielded by Bryan, and a water bottle as the mini-bat allegedly used by the victim or someone in his group. For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of December 7, 2009, 15-year-old Fabian S. was walking in Anaheim when he encountered Bryan and Bryan's brother Marcus.[1] Bryan said "Ay Nigga," ran up to Fabian, and started stabbing him with a knife. Marcus stood by and watched. Fabian suffered three wounds to his left shoulder area, cuts on his wrist, and one knife wound to his stomach and another to his chest. Bryan and Marcus fled in a silver sedan driven by someone else. After the stabbing Fabian went to Martin H.'s apartment.

Fabian knew Bryan and Marcus by name, but initially denied to police officers he knew who attacked him. He told the officers two unknown men approached and asked, "where you from" (i.e., what gang are you in) or "what's up." When Fabian responded "kick back, fools," one of the men attacked him. Fabian said the assailant used a silver metal folding knife about as long as his hand (five to seven inches).

A homicide detective interviewed Bryan at the police station two days after the crime. In June 2009, Bryan had punched Fabian in the face several times in front of a convenience store, sending Fabian to the hospital for stitches. When confronted with this

---

[1] Marcus initially lied to police, claiming he was not with Bryan and denied being involved in the stabbing. He later pleaded guilty to assault and admitted the gang enhancement in exchange for a time-served one-year local sentence and probation.

2

information, Bryan admitted he fought Fabian with fists about a year earlier because he believed Fabian had slept with his girlfriend, but denied stabbing Fabian. Bryan claimed he was home the entire day when Fabian was assaulted. Officers found a silver folding knife and a steak knife in the closet of a bedroom Bryan shared with Marcus.

Marcus testified he and Bryan picked up some marijuana on the morning of the stabbing. According to Marcus, Bryan brought a knife so they could cut open some cigars and insert the marijuana. After smoking marijuana they spotted Fabian and others in an alley. Marcus heard a whistle, and saw Fabian and another man approach. When Fabian said, "what's up now?" Bryan and Marcus ran in different directions. Marcus turned around and saw one of the men with a red mini-bat. Bryan later told Marcus, "I might have stabbed somebody."

Fabian testified he did not remember telling officers Bryan asked "where you from," but claimed it was a lie if he did say that. He also claimed to have lied if he told officers Bryan and Marcus left the scene in a car driven by another male. When police interviewed him about the June 2009 punching incident, Fabian claimed an unknown man punched him. Fabian had a juvenile criminal record that included possessing knives and residential burglaries.

Bryan testified he and Marcus noticed several males walking towards them, including Fabian, another man with a red bat, and a short man holding a kitchen knife. Fabian said "what's up now, fool?" Bryan pushed Marcus and told him to run. As both men fled, Bryan pulled out his knife. He glanced back while running and saw two of the men chasing him. Reaching an impasse in a cul-de-sac, Bryan turned around, and the man with the bat swung it at him. Bryan punched his assailant, grabbed him by his shirt, and threw him down. Bryan turned and began stabbing Fabian as Fabian restrained him by putting his arms around Bryan's shoulders. Bryan demonstrated how Fabian grabbed him, and how he stabbed Fabian, but neither the prosecutor nor the defense counsel described Bryan's demonstration for the record. During the struggle with Fabian, Bryan

3

received a blow to the back of his head. Fabian released his grasp of Bryan, who fled the scene. [2]

Bryan testified he lied to the officers in his pretrial interview because they told him several witnesses claimed he attacked Fabian with a knife and he did not believe the officers would accept his version. Bryan identified a photograph of Martin as the person with Fabian carrying the kitchen knife. Martin also had been with Fabian when Bryan assaulted Fabian in 2009.

The parties stipulated Martin possessed an ice pick in his left coat pocket on August 31, 2010, and Martin and three other suspects chased a person down an alley

---

[2]   We reproduce Bryan's testimony describing the assault: "[Q.] What happens when you get to the gate at the cul-de-sac? Do you turn around? What happens? [A.] I turned around. The white guy with the bat, the tall white guy, he swings the bat with me. I sock him and I grab his shirt and I throw him down, and after I threw him down, I got hit in the back of my head and I turn around and I just started stabbing. I started stabbing. He was holding onto me. [Q.] Okay. Hold on. So – the guy turns, tries to hit you with the bat, but you're able to throw him off? [A]. Yes, ma'am. [Q.] Did he make contact? [A.] What do you mean? [Q.] Did the bat actually hit you or were you able to – did he miss you with the bat? [A.] Well, he missed the first time he swung. [Q.] Okay. And you were able to throw him to the ground? [A.] Yes, ma'am. [Q.] And then someone, someone else was attacking you; is that correct? [A.] Yes, ma'am. [Q.] Okay. When you turn around to address that person, did you – what did you do? [A.] I turned around and just started stabbing, and then the guy grabbed me like this (indicating) and I was just trying to get him off. So I was just like going crazy, and then that's when I get hit in the head. I'm not sure if it was with a bat. I just know I got hit in the head and I fell off balance, but I believe Fabian – now that I know for sure it was Fabian because they said Fabian got stabbed – he let go at the same time and I just started running. [Q.] So at the time that you believe you were stabbing or that you remember stabbing, where was the other person positioned on you, if you remember? [A.] The guy that I was stabbing? [Q.] Yeah. [A.] He was like over, like, like once I turned around and started stabbing, he put his arms on my shoulders like trying to like do – I don't know what he was trying to do, but he put his arms around my should. [Q.] So was your first stab underneath or to the side? [A.] I believe it was underneath because when I turned around, I went like that (indicating) and then that's when he put his arm around. I just started going crazy. [Q.] Did you continue – did you continue to keep moving your arms after you stabbed him one? [A.] Yes, several times. [Q.] Did he eventually let go? [A.] Yes, when I got hit in the head."

4

and assaulted him on November 13, 2010.  Martin punched the victim and the other assailants hit the person with broom handles.

Following a trial in October 2012, the jury convicted Bryan as noted above. The trial court imposed a low-term five-year sentence for attempted murder and a consecutive three year term for the GBI enhancement.

## II

### DISCUSSION

*Jury Misconduct*

On October 24, 2012, the trial court received an anonymous letter from a juror describing a demonstration the jurors conducted in the jury room during deliberations.  The juror explained he wrote the letter because the bailiff told the jury at the end of deliberations the attorneys might be interested in talking to the jurors to determine what influenced their decisions and the juror did not want to stay after trial to talk to counsel because Bryan's friends and family were in the courtroom.

The juror disclosed in the letter:  "We tried to reenact [Bryan's] version of the stabbing in the jury room, using a pen as the knife and a water bottle as the minibat. The wound on Fabian's shoulder did not make sense given [Bryan's] story.  If [Bryan] and Fabian were in the position described, and [Bryan] had used the knife as described, the wound on Fabian's shoulder should have been a slashing wound.  But it was clearly a stabbing wound."

The trial court questioned all but two of the jurors individually under oath regarding the demonstration in an April 2013 evidentiary hearing.  Although several jurors did not recall the demonstration, one juror described how another juror held a pen in her hand, grabbed the other juror from behind, "put the arm that didn't have the pen around and then started to do something like reenacting a stabbing."

The foreperson recalled a reenactment involving a pen:  "There was myself and one other juror.  We were standing up.  The rest of the jurors were seated and we

were attempting to do the movements that were described in the courtroom with regards to the situation when [Bryan] had run. [¶] . . . [¶] . . . Motions, I made motions. [¶] . . . With my arms using a pen targeted at the parts on the body where the stab wounds were." The foreperson explained, "we were showing how they would have had to have their hand positioned to inflict the stab wounds that were inflicted and how the victim's arms would have had to be positioned to receive the wounds that he received and what would have had to physically be done for someone to grab onto the back of [Bryan] and then get thrown off and then hit – have [Bryan] be hit on the head with a bat."

The juror who wrote the letter described the reenactment: "We had one person take the role of Fabian, one person take the role of [Bryan], and one person take the role of the person with the mini bat. Let's see. For the knife, we used a pen. As a substitute for the mini bat, we used a water bottle substitute, a fairly large one. I actually saw one of the jurors with one exactly the same height. And let's see. We looked at [Bryan's] testimony describing what had happened there and we tried to duplicate what he described in his testimony." The juror continued, "A person stood as Fabian was described to have been standing. A person stood as [Bryan] was described as standing. The person who was the stand-in for [Bryan] moved their arm in the same way as [Bryan] described moving the knife there, and we examined where the, quote, 'knife' appeared to impact the, quote, 'victim's' body." The juror stated there were some questions about whether it was "physically possible to do what had been described" by Bryan. Other jurors vaguely recalled the incident in similar terms.

The trial court denied Bryan's new trial motion. The court found there was no juror misconduct and if there was misconduct it did not influence the verdict. The trial court relied on the foreperson's "persuasive" testimony in finding the jurors' reenactment "was not an experiment but merely a recreation of what the evidence produced." The court found the jurors' use of the pen and the bottle "was just something that had no significance in terms of creating additional information."

6

The issue of juror misconduct presents a mixed question of law and fact. We defer to the trial court's factual findings if supported by substantial evidence, but we independently determine whether misconduct occurred, and whether the misconduct was prejudicial. (*People v. Collins* (2010) 49 Cal.4th 175, 242 (*Collins*); *People v. Nesler* (1997) 16 Cal.4th 561, 578, 582 & fn. 5; § 1181, subds. (2), (3) [trial court may grant a motion for new trial when a verdict has been rendered and the jury received evidence out of court]; *People v. Cumpian* (1991) 1 Cal.App.4th 307, 311 (*Cumpian*); cf. *People v. Ault* (2004) 33 Cal.4th 1250, 1263-1264 [abuse of discretion standard applies where court *grants* new trial motion based on juror misconduct].) If misconduct occurred, a presumption of prejudice arises. (*Collins, supra,* at p. 242.)

As explained in *Collins*, "'It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.'" (*People v. Collins, supra,* 49 Cal.4th at p. 243, italics omitted.)

Bryan contends the jury committed prejudicial misconduct because it "attempted to replicate an incident that was not subject to experimentation because of the jury's inability to accurately duplicate critical factors from the incident such as the size, strength, and height of the individuals involved in the stabbing and the altercation with

7

the mini-bat, the amount of force used to stab with a knife, and the weight and stature of the knife used in the actual stabbing."

Bryan relies on *Bell v. State of California* (1998) 63 Cal.App.4th 919. There, the plaintiff claimed police officers falsely arrested him, and testified how officers grabbed his arms, held his wrists behind his back up to his neck, forced him to bend over and stand on his toes, and walk down a flight of stairs and out of the building in this position. (*Id.* at p. 925.) The trial court disallowed an in-court demonstration fearing someone would be injured. (*Id.* at p. 932.) During deliberations one of the jurors informed the other jurors she and a third party attempted to reenact the plaintiff's version out of court, but she fell over and therefore disbelieved the plaintiff's testimony. (*Id.* at p. 930.) The appellate court affirmed the trial court's order for a new trial, and quoted with approval the trial court's explanation: "'The incident the juror was attempting to replicate is not subject to experimentation because of the inability to accurately duplicate critical factors such as the size, strength and height of the individuals, the amount of force involved, and the specific or unusual physical characteristics of each individual involved." . . . [¶] . . . [¶] . . . [T]his particular experiment would not have been within the lines of offered evidence even had it been conducted *in* the jury room with all twelve jurors present. The fact that the experiment was performed by one juror, aided by unknown third parties, outside of the court room and the deliberations, is more egregious and resulted in outside influences or extrinsic evidence permeating the jury's deliberation on perhaps the key factual determination in the case.'" (*Id.* at pp. 932-933, italics added.)

Bryan also cites *People v. Castro* (1986) 184 Cal.App.3d 849. There, a law enforcement officer allegedly used binoculars to identify the defendant as a participant in an arson from a distance of 50 to 100 yards. (*Id.* at p. 852.) A juror tried to recreate the scenario by using binoculars at home, and then reported the results of his reenactment to the other jurors. (*Id.* at pp. 852-853.) The appellate court reversed because there was no showing the juror's binoculars were "'similar'" to the officer's binoculars or that lighting

8

conditions and distances were similar to the conditions at the time of the officer's identification.  (*Id*. at p. 854.)

We do not find Bryan's reliance on *Bell* and *Castro* persuasive.  In both cases a juror conducted an out-of-court and dissimilar reenactment of the evidence and reported the results to the other jurors.  Here, in contrast, the jurors briefly reenacted in the jury room Bryan's description of how he stabbed Fabian to determine whether Bryan could have inflicted Fabian's injuries in the manner described.

The current case is analogous to *People v. Cooper* (1979) 95 Cal.App.3d 844.  There, patrol officers driving down a street saw Cooper look over his shoulder in their direction, reach into his waistband, and toss an object 15 feet onto a nearby lawn.  The officers arrested Cooper when they found heroin in the discarded bag.  Cooper denied possessing the contraband or tossing the object.  On appeal, Cooper argued the jury committed misconduct when it reenacted the officer's testimony and demonstration of how Cooper had thrown the bag.  The appellate court affirmed Cooper's conviction, explaining:  "During the trial, [the officer] had demonstrated the manner in which the defendant had thrown the contraband.  The jurors simply repeated the officer's reenactment.  Nothing requires that the jury's deliberations be entirely verbal, and we would expect a conscientious jury to closely examine the testimony of the witnesses, no less so when that testimony takes the form of a physical act.  There was no error in denying the motion for new trial on this ground."  (*Id*. at p. 854.)

*Cumpian, supra,* 1 Cal.App.4th 307 is also instructive.  There, the defendant was charged with robbery when he resisted a Kmart security guard's attempt to detain him for stealing a duffel bag.  During deliberations the jurors placed a duffel bag, admitted in evidence, with the strap over their necks and the bag clutched against their torsos in a fashion similar to that described by the witnesses to determine "'whether the accused, faced with apprehension by the security guard, could easily have removed the duffle [*sic*] bag to avoid arrest.  If the bag was easily and quickly removable this would

support a conclusion that the accused intended to escape with the bag.'" (*Cumpian, supra,* at p. 311.) The *Cumpian* court summarized state and federal cases and determined the jurors did not conduct an impermissible experiment. *Cumpian* noted experiments outside the jury room with less than the entire jury present are prohibited, and jurors must not deviate from the evidence adduced at trial nor delve into other, new areas on their own. But jury room experiments, reenactments, and demonstrations based on the evidence are not barred.

Cumpian stated "the jury's use of the exhibit [duffel bag] did not invade *new fields* nor did their experiment with the duffel bag involve matters not within the scope and purview of the evidence. In fact, the declarations state that the jury used the exhibit in a similar fashion to that testified to and demonstrated by victim Laurie. *It is not the use of the exhibit which creates misconduct but its use in some manner outside the offered evidence.*" (*Cumpian*, *supra*, 1 Cal.App.4th at p. 315, second italics added.) The court concluded, "there was both verbal and demonstrative evidence concerning the way the duffel bag was slung over defendant's neck and body. The jury's reenactment of that evidence did not constitute the receipt of evidence out of court, but was merely an experiment directed at proffered evidence." (*Id.* at p. 316.)

Here, the jurors attempted to reenact Bryan's account to determine whether Bryan could have inflicted a stab wound to an attacker who held him from behind. The jurors concluded Bryan would have been unable to do so based on Bryan's testimony describing how he was restrained. Although the jurors used the pen as a prop for the knife, the dissimilarity between the knife and the pen loses significance here because the jurors sought to verify Bryan's claim he stabbed Fabian while being held by the shoulders. Whether Bryan was in position to stab rather than slash Fabian was the purpose of the reenactment, and this arguably could have been determined despite any dissimilarity between the pen and the knife. This is also true for the water bottle, which the jurors used to represent the minibat held by the other assailant. Nothing suggests

10

using representative items described by the testimony during a reenactment, during deliberations and in full view of all jurors, created new evidence. Nothing suggests the reenactment was not based on trial testimony, especially so because Bryan's demonstration during his testimony was not described for the record. This was not a case where jurors conducted out of court investigation and introduced new evidence into the case. (See Weisselberg, *Good Film, Bad Jury* (2007) 82 Chi.-Kent L.Rev. 717 [discussing fictional juror in "12 Angry Men" who displays to fellow jurors a knife identical to supposedly unique murder weapon and advises other jurors he purchased knife three blocks from accused's home; incontrovertible misconduct because juror conducted an investigation, gave unsworn, untested testimony, and exhibited extraneous physical evidence in the jury room].) The reenactment fell within the lines of offered evidence and did not place the jurors in possession of evidence not offered at trial. No misconduct occurred, and therefore no presumption of prejudice arose.

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, ACTING P.J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.


11