Filed 11/24/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GEORGE P. CONWAY,<br><br>　　Plaintiff and Appellant,<br><br>　　　v.<br><br>COUNTY OF TUOLUMNE,<br><br>　　Defendant and Respondent. | F067505<br><br>(Super. Ct. No. CV56979)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Zumwalt Law Firm, Frank T. Zumwalt and Graham Lopez for Plaintiff and Appellant.

Brady & Vinding and Michael E. Vinding for Defendant and Respondent.

-ooOoo-

In an unsuccessful attempt to apprehend George P. Conway's adult son, Donald Conway,[1] who reportedly had fired shots at George, officers from defendant County of Tuolumne (County) fired a tear gas canister into George's mobile home.  Donald was not inside but was apprehended later.  George brought suit against the County for damage to

---

[1]We refer to George and Donald Conway by their first names to ease the reader's task.  No disrespect is intended.

his mobile home caused by the tear gas, alleging negligence, trespass, nuisance, and strict liability for an ultra-hazardous activity. The trial court granted the County's motion for summary judgment, finding the County immune under Government Code section 820.2,[2] which provides immunity for discretionary acts of County employees. George appeals, contending the trial court erred in finding the County immune from liability for any of his claims. We conclude that, under the facts and circumstances of this case, and based on the applicable law, County is immune from liability for the conduct of its officers. Accordingly, we affirm the judgment.

## *FACTS AND PROCEDURAL HISTORY*

In May 2011, George was living with Donald in a mobile home at 15970 Hidden Valley Road in Sonora (the 15970 house). On May 24, 2011, George was moving into his new home—a neighboring mobile home at 15990 Hidden Valley Road (the 15990 house).

At about 8:00 a.m. that day, two satellite TV service technicians arrived at the 15990 house to perform an installation. After Donald came over and then stormed off "all angry," the main technician wanted to get the job done as quickly as possible "and get out of here." About 10 minutes later, Donald came onto the deck of the 15990 house holding a handgun. George ran inside the 15990 house and locked the door. While George was standing to the side of the door, Donald fired three shots at the closed door. George went out the back door; both he and the technicians ran to a neighbor's house.

George requested law enforcement assistance in a 911 call; he told the dispatcher that his 51-year-old son Donald had fired gunshots, which blew the front door off the house, and had pointed the gun at him. George told the dispatcher to "please get the sheriff here quickly." George at first said that Donald still had the gun and still was at the

---

[2]Undesignated statutory references are to the Government Code.

2.

15990 house, but later told the dispatcher he was not aware of where Donald was "right now." The last time he saw Donald, "he was shooting the door off of the house."

Tuolumne County Sheriff's Department (Department) Sergeant Neil Evans and other officers responded to the call that gunshots were fired, arriving on the scene at 8:45 a.m. Dispatch had advised Evans that Donald, a felon prohibited from possessing a firearm, had a .357 revolver registered to him, was intoxicated, had brandished a handgun, had chased George into the 15990 house, and had fired three gunshots in George's direction. The two technicians told Evans they saw Donald fire a handgun in George's direction and both believed Donald had shot George.

Evans sent a deputy to the neighbor's house where George and the technicians were to speak with George, while he and another deputy watched the two houses. According to Evans, George told the deputy that Donald was still at the 15990 house and gave them permission to search it. Evans also claimed he confirmed with George that Donald was not seen leaving the 15990 house, that he was in possession of multiple firearms, and that Donald followed George into the 15990 house and was still there. Evans said George asked him to "go get him." George also told Evans that Donald had a leg injury and was not mobile.

George, however, denied telling Evans that Donald was in the 15990 house and claimed that, when he first spoke to Evans, he told Evans he did not know where Donald was, but he "was probably watching us from the woods surrounding us." According to George, when the first officer he spoke with asked him whether Donald was still in the 15990 house, he told the officer he did not know.

Evans and another deputy cleared the 15970 house to ensure Donald was not there while another deputy watched the 15990 house. Evans set up a perimeter around the 15990 house and directed a deputy to use a loudspeaker to ask Donald to come out, but Donald did not come out. Evans then went to the rear of the 15990 house and saw a burn mark on the front door where the door handle used to be, and a bullet fragment on the

3.

porch, as well as fresh blood near the door that appeared to be a smear mark from a hand. The door was closed. A local school was placed on lockdown.

Evans requested that dispatch send the acting lieutenant, Sergeant Jeff Wilson, to the scene so he could request the use of the SWAT team; after Wilson arrived on the scene, Wilson granted the request. According to Wilson, Evans told him he did not know if Donald was in the 15990 house. Based on his experience and Evans's statement, Wilson thought it possible Donald had run off into the woods. Evans planned to use the SWAT team to perform a "surround and callout for a barricaded subject," which entails surrounding the house, continuing to make announcements and, if needed, using a negotiation team to try to establish communication. Depending on the situation, the action can then escalate or deescalate.

SWAT commander Sergeant James Oliver asked the Calaveras County Hostage Negotiations Team to come to the scene and attempt to communicate with Donald inside the home. With Oliver's consent, the hostage negotiation team decided to attempt contact with a mobile "throw phone," which operates as a listening device, that was placed in the house by porting a window. Multiple calls were made to the phone over the course of 25 minutes, but George did not answer and nothing was heard from the phone. Evans did not hear anyone or see movement inside the house after the window was broken.

After Evans reviewed Donald's criminal history, he asked Oliver and Watson for authorization to deploy two tear gas canisters in an effort to resolve the situation and protect against the loss of life and damage to property. Evans made the request because it is an approved, but less-than-lethal alternative, and avoids the necessity of sending an officer into the residence at substantial risk of harm to person and property; otherwise, officers would be forced to "storm" the residence by kicking in both points of entry and attempting to subdue Donald without firing any shots. Based on Donald's criminal history and previous use of deadly force, Evans believed, in his professional opinion, that

4.

Donald would attempt to use deadly force against the officers. Oliver granted the request. Evans authorized the placement of one tear gas canister into the 15990 house, which the SWAT team did at 1:11 p.m. The gas filled the home. About eight minutes later, on Oliver's command, the SWAT team broke down the front door using a ram, put a diversionary device on the end of a flash bang pole, ignited it, and went into the house. No one was inside.

After the SWAT raid, deputies searched the surrounding area for Donald. Donald subsequently was captured. The gas residue could not be removed from the house and made the home uninhabitable. According to George, Evans did not ask him if he or the SWAT team could go inside the 15990 house, and Evans did not tell him anything about a SWAT raid or the use of tear gas. George claimed he did not know what the police did after they arrived on the scene.

*This lawsuit*

George filed suit against the County in September 2011. He later filed a first amended complaint, which alleges four causes of action: (1) negligence, (2) nuisance, (3) trespass, and (4) strict liability for an ultra-hazardous activity. George alleged that the County "negligently and carelessly" fired or threw tear gas into and damaged the 15990 house when it knew, or should have known, that Donald was not in the home, and the County was not justified in using the force employed. George further alleged the County's act of releasing tear gas in the house, rendering it unlivable and uninhabitable, constituted a nuisance, thereby entitling him to damages to abate the nuisance. George alleged the County's acts and omissions constituted a continuing trespass on his property, and the resulting contamination exceeded the scope of any privilege the County had to enter the property. Finally, George alleged the use of tear gas, which is not a matter of common usage, necessarily involved a risk of environmental harm to the home and people entering it, and as a proximate result of the County's actions, the 15990 house had been polluted.

5.

*The summary judgment motion*

The County filed a motion for summary judgment or, in the alternative, summary adjudication on the following grounds: (1) George consented to the presence of law enforcement and use of force by calling 911 and requesting law enforcement assistance in apprehending Donald at his house; (2) the County is immune under Penal Code section 844 due to exigent circumstances; and (3) discretionary immunity bars liability.

As pertinent here, the County contended it was entitled to discretionary immunity under section 820.2 as to all of George's claims because the officers on the scene were vested with discretion in how the suspected felon, Donald, would be arrested, and the decision to use tear gas was a discretionary decision. The County further asserted that, both from objective and subjective points of view, the officers acted reasonably under the circumstances, considering the information known to them, and therefore their conduct was not wrongful and is not actionable.

In his opposition to the motion, George argued that, because the SWAT team exceeded the scope of his permission to enter the property, consent was not a defense to his claims of trespass and nuisance, and Penal Code section 844 does not provide immunity for the officers' conduct as it is not an immunity statute. On the issue of discretionary immunity, George contended such immunity was unavailable because the SWAT team's decision to raid his home was not a basic policy decision formulated by policymakers, but instead was a ministerial decision not subject to immunity. While George conceded the decision to investigate was a discretionary one, he claimed the officers' subsequent actions, namely the decision to deploy the SWAT team and raid the property, merely were implementing that decision and therefore were not immunized. Finally, George asserted that, because the County's moving papers did not challenge his cause of action for strict liability, that claim remained viable.

At the conclusion of oral argument, the trial court granted the motion as to all causes of action. The trial court first noted that the parties had conceded that if there was

6.

discretionary immunity, consent was irrelevant. The trial court stated that the crux of the issue was discretionary immunity, which it found to be clearly present. The trial court explained that, while George's position was that the decision to use tear gas was not a discretionary one, it could "hardly think of a more discretionary decision that officers would have to make." The trial court recounted the evidence that showed the officers knew Donald had fired shots into the house but did not know where Donald was, and stated that, after marshaling the facts, Evans determined he wanted to enter the house to ascertain whether Donald was or was not there without putting the officers in the line of fire, so he asked for authorization to use tear gas. The trial court determined that all of those factors, and the weighing of them, was the essence of a discretionary decision.

The trial court found this case analogous to excessive-force cases because George was saying it was unreasonable for the officer to use tear gas to try to enter his house and found persuasive two federal cases and one California case, *Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675 (*Lopez*), on excessive force. The trial court disagreed with George that the decision to use tear gas was a ministerial, negligent decision, and instead found it was a discretionary one based on the balancing of the risks and facts as they appeared to the officers in the field, as well as the necessity to protect the public and George. Accordingly, the trial court found section 820.2 applied and, on that basis, granted the summary judgment motion. The trial court stated on the record that it found there were no disputed issues of fact on the issue of discretion and the officers' use of discretion that rendered summary judgment inappropriate, and believed there were sufficient undisputed facts that the exercise of discretion was clear and summary judgment appropriate.

### *DISCUSSION*

On appeal, George challenges the trial court's finding that the County is entitled to discretionary immunity with respect to his claim that the officers decided to deploy the SWAT team and raid his home "despite almost conclusive evidence no one was inside."

Specifically, he contends the officers were negligent when they ignored the evidence indicating that Donald was not in the 15990 house and "unnecessarily gassed the property," and the actions performed while implementing the decision to arrest Donald were ministerial and therefore not immune from liability.

*Standard of review*

Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "A three-step analysis is employed in ruling on motions for summary judgment. First, the court identifies the issues framed by the pleadings. Next, the court determines, when the moving party is the defendant, whether it has produced evidence showing one or more of the elements of the cause of action cannot be established or there is a complete defense to that cause of action. If the defendant does so, the burden shifts to the plaintiff to show the existence of a triable issue of material fact as to that cause of action or defense." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.)

"In ruling on the motion, the court must consider all of the evidence and all of the inferences reasonably drawn therefrom, and must view such evidence and such inferences in the light most favorable to the opposing party." (*LPP Mortgage, Ltd. v. Bizar* (2005) 126 Cal.App.4th 773, 776.) "'All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment.'" (*Ibid.*) An order granting summary judgment is reviewed de novo. (*Susag v. City of Lake Forest* (2002) 94 Cal.App.4th 1401, 1408.)

*Discretionary immunity*

"In California, all government tort liability must be based on statute." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457; *Wilson v. County of San Diego* (2001) 91 Cal.App.4th 974, 979-980.) "Under the provisions of the California

[Government] Claims Act, '*a public employee* is liable for injury caused by his act or omission *to the same extent as a private person,*' except as otherwise specifically provided by statute.  ([] § 820, subd. (a), italics added.)  In addition, the [Government] Claims Act further provides that '[*a*] *public entity* is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment *if the act or omission would ... have given rise to a cause of action against that employee,*' unless 'the employee is immune from liability.'  ([] § 815.2, subds. (a), (b), italics added.)"  (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 715.)**[3]**

Thus, the Government Claims Act "establishes the basic rules that public *entities* are immune from liability except as provided by statute (§ 815, subd. (a)), that public *employees* are liable for their torts except as otherwise provided by statute (§ 820, subd. (a)), that public entities are vicariously liable for the torts of their employees (§ 815.2, subd. (a)), and that public entities are immune where their employees are immune, except as otherwise provided by statute (§ 815.2, subd. (b))."  (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 980 (*Caldwell*).)

California's common law has long provided personal immunity from lawsuits challenging a governmental official's discretionary acts within the scope of authority. (*Caldwell, supra,* 10 Cal.4th at p. 979.)  The traditional immunity for discretionary acts is addressed in the Government Claims Act under section 820.2, which states that, "'[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise

---

**[3]**Effective January 1, 2013, section 810 was amended to adopt the short title "Government Claims Act" to refer to division 3.6, parts 1 through 7, of the Government Code (§ 810 et seq.).  (See *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 741-742 ["Because of the broad scope of the claim requirements … 'Government Claims Act' is a more appropriate short title than the traditional 'Tort Claims Act.'"].)

of the discretion vested in him, whether or not such discretion be abused.'" (*Caldwell, supra,* at p. 980.)

As our Supreme Court explained in *Caldwell*, in *Johnson v. State of California* (1968) 69 Cal.2d 782, the court established a "'workable definition' of immune discretionary acts," which "draws the line between 'planning' and 'operational' functions of government." (*Caldwell*, *supra*, 10 Cal.4th at p. 981.) "Immunity is reserved for those '*basic policy decisions* [which have] … been [expressly] committed to coordinate branches of government,' and as to which judicial interference would thus be 'unseemly.' (*Id.* at p. 793, italics in original.) Such 'areas of quasi-legislative policy-making … are sufficiently sensitive' (*id.* at p. 794) to call for judicial abstention from interference that 'might even in the first instance affect the coordinate body's decision-making process' (*id.* at p. 793). [¶] On the other hand, said *Johnson*, there is no basis for immunizing lower-level, or 'ministerial,' decisions that merely implement a basic policy already formulated. (*Johnson*, *supra*, 69 Cal.2d at p. 796.) Moreover, we cautioned, immunity applies only to *deliberate and considered* policy decisions, in which a '[conscious] balancing [of] risks and advantages … took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision. [Citations.]' (*Id.* at p. 795, fn. 8.)" (*Ibid.*)

Discretionary immunity under section 820.2 has been found to apply to many areas of police work. Courts have found the following to constitute discretionary decisions for which police officers are immune under section 820.2: (1) the decision to pursue a fleeing vehicle (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 519 & fn. 13 [noting that, while long line of Court of Appeal decisions have held that negligence liability may not be based on officer's decision to engage in vehicle pursuit, the California Supreme Court has never ruled on question]; *Bratt v. City and County of San Francisco* (1975) 50 Cal.App.3d 550, 553 (*Bratt*)); (2) the decision to investigate or not investigate a vehicle accident (*McCarthy v. Frost* (1973) 33 Cal.App.3d 872, 875);

10.

(3) the failure to make an arrest or to take some protective action less drastic than arrest (*Michenfelder v. City of Torrance* (1972) 28 Cal.App.3d 202, 206 (*Michenfelder*)); (4) the decision whether to use official authority to resolve a dispute (*Watts v. County of Sacramento* (1982) 136 Cal.App.3d 232, 234-235 (*Watts*)); and (5) the decision whether to remove a stranded vehicle (*Posey v. State of California* (1986) 180 Cal.App.3d 836, 850; *Bonds v. State of California ex. rel. Cal. Highway Patrol* (1982) 138 Cal.App.3d 314, 321-322).

Police officers, however, are not immune under section 820.2 when their acts are ministerial or public policy dictates against immunity. Accordingly, courts have determined discretionary immunity does not apply to the following: (1) an officer's conduct of an accident investigation after the officer made the discretionary decision to undertake the investigation (*Green v. City of Livermore* (1981) 117 Cal.App.3d 82, 87-89; *McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252, 261-262 (*McCorkle*); (2) arresting the wrong person while executing a warrant (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 929) (*Bell*); (3) deciding to arrest an individual when there was no probable cause to do so (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1047, 1051) (*Gillan*); and (4) using unreasonable force when making an arrest or overcoming resistance to it (*Scruggs v. Haynes* (1967) 252 Cal.App.2d 256, 264-268).

The issue in the present case is whether the SWAT team's actions constitute discretionary decisions that immunize the County under sections 820.2 and 815.2, subdivision (b). Comparing this case to those which determined discretionary immunity did not apply, George argues the SWAT team's decision to "raid" his home was not a "basic policy decision" but instead was a tactical decision outside the scope of section 820.2 immunity. While George concedes the decision to deploy the SWAT team was a discretionary act, he argues all subsequent decisions made and acts performed that implemented the decision to deploy were ministerial and therefore not immune from liability. The County, on the other hand, argues that, like those cases cited above which

11.

found the officers' actions constituted discretionary decisions, section 820.2 also precludes liability for the decisions made while attempting to arrest Donald.

There apparently are no published cases which address the issue presented here, namely whether discretionary immunity applies to the selection of the means used to effectuate an arrest. This issue was expressly left undecided in a case the County cites, *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 392 (*Customer Co.*). In that case, the court held that the defendants, the City of Sacramento and Sacramento County, could not be liable in inverse condemnation for allegedly extensive property damage caused to a grocery and liquor store when the police fired tear gas into the store while trying to capture an apparently armed and dangerous felony suspect. (*Id.* at p. 371.)

The plaintiff in *Customer Co.* had sued the public entities for both inverse condemnation and negligence. The trial court granted judgment on the pleadings in favor of the public entities, finding they were immune from liability pursuant to section 820.2, and the inverse condemnation claim failed because the police's actions were a proper exercise of the police power. The appellate court affirmed the judgment. Our Supreme Court granted review solely on the inverse-condemnation issue. After oral argument, the court requested supplemental briefing on the issue of whether the plaintiff would be entitled to relief under the Government Claims Act, but in its brief, the plaintiff expressly waived the right to relief under that Act. (*Customer Co.*, *supra*, 10 Cal.4th at pp. 371-372, 391.)

After the court concluded that the plaintiff could not maintain a claim for inverse condemnation, the court explained that, "the government's potential liability for this type of conduct properly should be evaluated" under the Government Claims Act. (*Customer Co.*, *supra*, 10 Cal.4th at p. 391.) The court stated that, in order to determine whether the plaintiff could recover under the Act, it would need to decide whether the trial court and Court of Appeal correctly concluded the public entities were immune under sections 820.2 and 815.2, subdivision (b). (*Customer Co.*, *supra*, at p. 392.) The court

recounted its prior holding that section 820.2 "'confers immunity only with respect to those "basic policy decisions" which have been committed to coordinate branches of government, and does not immunize government entities from liability for subsequent ministerial actions taken in the implementation of those basic policy decisions[,]'" and recognized it had not resolved "whether the selection of the means employed to effectuate an arrest is such a 'basic policy decision' to which the immunity applies." (*Customer Co.*, *supra*, at p. 392.) The court determined that, in light of the plaintiff's express waiver of its negligence claims, it would be inappropriate to decide whether section 820.2's immunity provisions apply. (*Customer Co.*, *supra*, at p. 392.)

Thus we are presented with an issue of first impression. Relying primarily on *Watts*, the County asserts the gravamen of George's complaint is the decision to use tear gas and contends that decision clearly was a discretionary one entitled to immunity. In *Watts*, Sacramento County Sheriff's officers intervened in a disagreement between a landowner and the plaintiffs over the plaintiffs' right to harvest crops on the owner's land. After the officers ordered the plaintiffs off the land, the plaintiffs sued. (*Watts*, *supra*, 136 Cal.App.3d at p. 234.) The appellate court determined the officers had performed a discretionary act and therefore were immune from suit under section 820.2. (*Watts*, *supra*, at pp. 234-235.)

The plaintiffs argued the officers were not immune because they had performed a "'negligent investigation'" following their discretionary decision to settle the dispute by failing to investigate whether the plaintiffs had any legal right to be on the property. (*Watts*, *supra*, 136 Cal.App.3d at p. 235.) The appellate court disagreed, stating: "The fallacy of plaintiffs' argument lies in their assumption that once law enforcement officials have 'decided' to intervene in a dispute, *any* subsequent action by the officials is ministerial. There is no legal basis for such assertion. [¶] Here, a disagreement ensued as to plaintiffs' right to be on [the] property. In order to settle the dispute the officers were obliged to exercise their discretion after they had observed what was happening and

had listened to the explanation of those present.  [Citation.]  Any direction given by the officers purporting to exercise official authority would have been an invasion of the personal liberty of at least some of those present.  [Citation.]  'Such intrusions are … a regular and necessary part of police work conducted for the preservation of public safety and order,' and the decision to use this official authority on any particular occasion '*is peculiarly a matter of judgment and discretion*' for which the officers (and defendant) may not be held liable in tort."  (*Ibid.*, citing *Michenfelder*, *supra*, 28 Cal.App.3d at p. 206.)

Here, once the officers decided to arrest Donald, they were vested by the Department with discretion to determine the means by which the arrest should be carried out.  This discretion included the possible use of tear gas as a way to determine whether Donald was in George's house.  The officers exercised their discretion by observation and listening.  As our Supreme Court has noted:  "The decision, requiring as it does, comparisons, choices, judgments, and evaluations, comprises the very essence of the exercise of 'discretion' and we conclude that such decisions are immunized under section 820.2."  (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 749.)

Relying on *McCorkle*, *supra*, 70 Cal.2d 252 and *Bratt*, *supra*, 50 Cal.App.3d 550, George asserts we should distinguish between the decision to deploy the SWAT team, which he admits is a discretionary decision, and the SWAT team's conduct after being deployed, which he asserts is ministerial.  He contends the SWAT team's decision to use tear gas was merely the means to carry out the decision to deploy the SWAT team.

In *McCorkle*, a police officer was called to the scene of an automobile accident.  On his arrival, he talked to the plaintiff, who was involved in the accident, on the corner of the intersection.  Without setting out flares or interrupting the sequence of the traffic signals, the officer walked to the center of the intersection, followed by the plaintiff, and asked the plaintiff to show him the skidmarks.  The plaintiff was struck by an automobile that entered the intersection on a green light and later sued the officer and others for

14.

negligence. (*McCorkle*, *supra*, 70 Cal.2d at pp. 255, 259-260.) The jury found in the plaintiff's favor and against the City of Los Angeles. (*Id.* at p. 255.) Our Supreme Court rejected the city's argument that the officer was immune from liability under section 820.2. (*McCorkle*, *supra*, at pp. 260-262.)

The court explained that, whether or not a public employee is immune under section 820.2 "depends in many cases upon whether the act in question was 'discretionary' or 'ministerial,' respectively. [Citations.] For this reason, contentions such as the City makes here have frequently required judicial determination of the category into which the particular act falls: i.e., whether it was ministerial because it amounted 'only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own,' or discretionary because it required 'personal deliberation, decision and judgment.'" (*McCorkle*, *supra*, 70 Cal.2d at pp. 260-261.) The court further explained that, even if a public employee's act is classified as "discretionary," the employee is not immune if the injury to another results, not from the exercise of discretion to undertake the act, "but from his negligence in performing it after having made the discretionary decision to do so." (*Id.* at p. 261.)

The court concluded that, even if the officer exercised his discretion in undertaking the accident investigation, "section 820.2 did not clothe him with immunity from the consequence of his negligence in conducting it. He would have been immune if plaintiff's injury had been the *result* of [the officer's] exercise of discretion. [Citations.] It was not: it resulted from his negligence after the discretion, if any, had been exercised." (*McCorkle*, *supra*, 70 Cal.2d at pp. 261-262.) The court held that, because there was no causal connection between the exercise of discretion and the injury, statutory immunity did not apply. (*Id.* at p. 262.)

In *Bratt*, police officers decided to pursue a fleeing vehicle through city streets; during the pursuit, the car the officers were chasing collided with another vehicle. The occupants of that vehicle sought damages for personal injuries and wrongful deaths that

15.

occurred in the collision. (*Bratt*, *supra*, 50 Cal.App.3d at p. 552.) On appeal from a judgment of nonsuit in favor of the City and County of San Francisco, the Court of Appeal, noting that the only police conduct that caused the accident was the decision to pursue the fleeing vehicle, held that decision to be a discretionary act protected by section 820.2. (*Bratt*, *supra*, at p. 553.) The court found the case distinguishable from *McCorkle*, as in *McCorkle* there was no causal connection between the exercise of discretion and the injury, while the only negligence alleged was the "officers' decision to give high speed chase rather than in the officers' execution of that decision." (*Bratt*, *supra*, at p. 554.)

George asserts these cases demonstrate that only the decision to deploy the SWAT team, not the SWAT team's conduct after being deployed, is entitled to immunity. But, as explained in *Watts*, George relies on the false assumption that once police decide to intervene in a dispute, any subsequent action by the police is ministerial. (*Watts*, *supra*, 136 Cal.App.3d at p. 235.[4]) Instead, each decision must be examined to determine whether it constitutes a discretionary or ministerial decision. In this case, the decision to use tear gas resulted from choices and judgments made in response to changing circumstances; it was not made in blind obedience to orders. The difference between this case and *McCorkle* is that here, the decision to use tear gas was based on personal deliberation, decision and judgment, while asking the plaintiff in *McCorkle* to come into the intersection involved no such deliberation, decision, or judgment.

---

[4]George argues *Watts* is inapplicable here because the case addressed only the decision whether to intervene, not acts undertaken subsequent to that decision. We disagree, as it was not the officers' decision to intervene that was at issue, but rather their implementation of that decision by ordering the plaintiffs off the land without investigating whether the plaintiffs had any legal right to be on the property. (See *Watts*, *supra*, 136 Cal.App.3d at p. 235.)

The other cases upon which George relies do not compel a different result. In *Bell*, the appellate court held that officers who executed an arrest warrant on the wrong person, without a reasonable basis for concluding the arrestee was the man they sought, were not entitled to discretionary immunity under section 820.2 because they did not exercise the level of discretion required for immunity to apply, as their actions did not involve an actual exercise of discretion, i.e., a conscious balancing of risks and advantages, or constitute a basic policy decision. (*Bell*, *supra*, 63 Cal.App.4th at p. 929.) In *Gillan*, the appellate court held section 820.2 immunity did not apply to the police's decision to arrest the plaintiff, which was found to be without probable cause, as that decision "was not a basic policy decision, but only an operational decision by the police purporting to apply the law." (*Gillan*, *supra*, 147 Cal.App.4th at p. 1051.)

In *Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448, the plaintiffs sued the city and individual city officials for various claims arising out of the city's demolition of their rented home and its contents as part of a nuisance abatement program. (*Id.* at p. 453.) The appellate court held that the city employee charged with administering the program, who conducted a hearing at which the property on which the house sat was declared a public nuisance and sent a letter to that effect, was immune under section 820.2 because his participation was limited to making the discretionary policy decision to declare the property a nuisance. (*Ogborn*, *supra*, at p. 461.) The appellate court, however, held the code enforcement officer who actively participated in the implementation of the program with respect to the property by giving the order for the bulldozer to demolish the plaintiffs' house and all their belongings was not immune because his actions constituted subsequent ministerial actions implementing the basic policy decision to declare the property a nuisance. (*Id.* at pp. 454, 455-456, 461.)

We find the decisions made in the present case very different from the ones in these cases. The arrest of a suspected armed assailant mandates decisions affecting public safety; liability for such split-second decisions conceivably could hamstring

17.

officials with unpleasant results. George argues that by extending immunity in this case, every action by an officer, no matter how minor, will be subject to immunity as long as the officer states he or she made a choice between two options. Our decision, however, is not that broad. We hold only that, given the importance of the decisions involved and the potential impact of liability on these decisions, section 820.2 provides immunity for the officers' actions here under the authority set forth in *Caldwell*.[5]

Finally, George argues he identified triable issues of fact regarding the reasonableness of the officers' conduct which preclude summary judgment, citing *Robinson v. City and County of San Francisco* (1974) 41 Cal.App.3d 334. That case, however, involved the issue of whether an officer was immune from liability for false arrest under Civil Code section 43.55, subdivision (a), which applies when an officer, acting pursuant to a warrant, effects the arrest without malice and with the reasonable belief the arrestee was the one named in the warrant. (*Robinson*, *supra*, at p. 336.) Section 820.2, however, does not contain a reasonableness requirement. Instead, it applies when the public employee's act or omission resulted from the exercise of discretion, even if such discretion is abused. (§ 820.2.) Since we conclude that the County is immune under sections 820.2 and 815, subdivision (b), the officers' reasonableness is irrelevant.[6]

---

[5]George contends the trial court erred when it relied on the excessive-force cases of *Price v. County of San Diego* (1998) 990 F.Supp. 1230; *Reynolds v. County of San Diego* (1994) 858 F.Supp. 1064, affirmed in part and remanded in part, (9th Cir. 1996) 84 F.3d 1162; and *Lopez*, *supra*, 196 Cal.App.4th 675, in reaching its decision. This court, however, reviews only the result, not the trial court's reasoning, which is irrelevant to appellate review following summary judgment. (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140; *Florio v. Lau* (1998) 68 Cal.App.4th 637, 653.) Accordingly, we do not discuss these cases, as they are unnecessary to our decision.

[6]Because we conclude the County is entitled to immunity under sections 820.2 and 815.2, subdivision (b), we do not address the County's alternate contention that George's lawsuit is barred based on George's consent.

18.

## *<u>DISPOSITION</u>*

The judgment is affirmed. Costs on appeal are awarded to the County.

_____
Oliver, J.

WE CONCUR:


_____
Cornell, Acting P. J.


_____
Gomes, J.

19.