Filed 11/10/22  Bazan v. Curry CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| MARIA BAZAN, | |
| Plaintiff and Appellant, | E075075 |
| v. | (Super. Ct. No. RIC1610349) |
| TAROO CURRY et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.
Affirmed.

Jass Law and Jeremy Jass; Law Offices of Eric K. Chen and Samantha Larsen, for
Plaintiff and Appellant.

Disenhouse Law and Bruce E. Disenhouse; Arias & Lockwood and Christopher D.
Lockwood, for Defendants and Respondents.

# I.

# INTRODUCTION

Appellant Maria Bazan called 911 because she was concerned for her daughter, Natalie Bazan, who did not come home the night before. She told the responding Riverside County Sheriff's Deputies that she thought Natalie[1] was in danger inside her ex-boyfriend's apartment. The deputies repeatedly knocked on the apartment's door and windows, but did not see or hear any response. Maria asked the deputies to break into the apartment, but they declined to do so because they did not believe they could enter the apartment lawfully. Instead, the deputies continued investigating, sought advice on how to proceed from their supervisor, repeatedly banged on the door, talked to neighbors and the property manager, and went into adjacent apartments to listen for sounds from the boyfriend's apartment.

The deputies eventually knocked on the apartment's door nonstop for about five to 10 minutes. The ex-boyfriend answered the door and appeared to have just woken up and had multiple deep lacerations on his arms. This prompted the deputies to enter the apartment, where they found Natalie dead. It was later determined that Natalie died of asphyxiation caused by her ex-boyfriend choking her with his hands.

---

[1] Because appellant and Natalie share the same last name, we refer to them by their first names for clarity. We mean no disrespect.

Maria sued the deputies, their supervisor, and the County of Riverside for various negligence claims. The trial court granted summary judgment to defendants, and Maria appeals. We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Natalie began dating Miguel Nunez when they were in high school. Their relationship continued after Natalie graduated in 2014.

In April 2015, Natalie sought a Domestic Violence Restraining Order (DVRO) against Nunez. In her application for the DVRO, Natalie stated that Nunez had verbally abused her by calling her names and making threatening statements, threw her phone out of the car window while driving, and repeatedly contacted her despite her telling him to stop. He also hacked into her social media accounts, changed the passwords, and publicized private information about her on her social media pages.

The trial court granted a temporary DVRO, but eventually dismissed the case after Natalie failed to appear for the hearing on her DVRO request. The temporary DVRO therefore expired in April 2015.

About four months later, on August 11, 2015, Natalie told her best friend, Jasmin Velasquez, that she had plans for the day, but did not say what they were. Later that day, Natalie left her house around 4:00 or 5:00 p.m. without telling Maria where she was going. Natalie was supposed to pick up Maria around 8:00 p.m., but she did not show up. Maria called Natalie and it went straight to voicemail.

3

Velasquez tried calling Natalie but she did not pick up. Around 6:00 a.m. the following morning, Velasquez got a Snapchat message from Natalie that said she was with a "friend" and was going to a friend's house in Santa Ana "'to get away from things for a bit'" because she had "a lot on her plate." The message did not make sense to Velasquez and did not sound like Natalie wrote it, so she drove to Nunez's apartment.

Velasquez saw Natalie's car in the apartment complex parking lot. The car looked normal to Velasquez. Velasquez called Maria and her son, Josue Robledo, and the three of them went to Nunez's apartment around 8:00 a.m. They knocked, but there was no response. Velasquez heard only the sound of an air conditioner running. Maria thought she heard struggled breathing, but Velasquez did not hear anything other than the air conditioner.

Robledo called 911. Riverside County Sheriff's Deputies Taroo Curry and Cesar Martinez responded to the call and arrived at Nunez's apartment around 9:00 a.m. Robledo told Curry that Natalie had previously been in a relationship with Nunez and that Nunez abused her, although Natalie did not report it to law enforcement.

Velasquez showed the deputies the Snapchat message and explained that she did not think it was from Natalie. She also told them about the temporary DVRO and that Natalie had missed the hearing for a longer DVRO. Velasquez left to go to work shortly afterward.

4

The deputies knocked on the doors and windows of Nunez's apartment multiple times without a response. They confirmed with the apartment complex manager that they were at the right apartment.

By this point, Maria and Robledo began repeatedly asking the deputies to break into Nunez's apartment. They declined to do so because they thought they had no legal grounds to enter the apartment. At one point, Maria told the deputies she heard moaning or shouting inside the apartment. The deputies, who were standing next to Maria, did not hear anything.

The deputies asked Maria to go to her car and let them do their job. Maria stayed in or around her car for the next few hours.

The deputies continued knocking repeatedly on Nunez's apartment's door and windows. They continued to hear only the sound of the air conditioner.

Martinez then spoke with Nunez's next-door neighbor. The neighbor said she had not seen Nunez for about two or three days and had not recently heard any sounds coming from his apartment. The neighbor let Martinez into her apartment so he could listen for sounds coming from Nunez's apartment. Again, Martinez did not hear any sounds, nor did the neighbor.

With the consent of the property manager, the deputies went in to the vacant apartment on the other side of Nunez's apartment. They did not hear anything coming from Nunez's apartment, even though they placed their ears against the wall.

Curry asked dispatch to "ping" Natalie's cell phone. The cell service provider reported that the her phone's last known location was near a cell phone tower about a mile away from Nunez's apartment. The exact location of her phone was indeterminable, however, because it had been off for about three hours and 15 minutes.

During the investigation of Nunez's apartment, Curry called his supervisor, Sergeant Deputy George Reyes, multiple times seeking guidance. Reyes told Curry there was no legal basis to enter the apartment, but suggested additional things to investigate to determine if there was a legal ground to enter, such as signs of a struggle inside.

Curry and Martinez continued knocking and listening for sounds inside Nunez's apartment, but heard nothing. Around 1:45 p.m., nearly five hours after arriving at the scene, the deputies decided to knock a final time. They pounded on the door and windows for five to 10 minutes.

Nunez eventually opened the door. He looked like he had just woken up and had multiple deep lacerations on his arms. The deputies decided the lacerations provided exigent circumstances to lawfully enter Nunez's apartment. Martinez entered and found Natalie dead inside.

Maria sued Curry, Martinez, Reyes, and the County of Riverside (County) for three causes of action. The trial court sustained defendants' demurrer to the first two causes of action without leave to amend. Maria does not challenge that ruling on appeal.

6

Maria's third cause of action for "neglect of duty" in her operative Second Amended Complaint (SAC) alleges that the deputies had a duty to Natalie to enter Nunez's apartment or leave the area, and they breached that duty. At the direction of Reyes, however, the deputies declined to enter the apartment while staying at the premises. Maria alleges that their failure to enter the apartment or leave increased the risk of harm to Natalie. Maria claims they could have prevented Natalie's death if they had either entered or left the premises as opposed to remaining at the scene of the murder.

Instead, the deputies stayed outside the apartment for almost five hours, confining Nunez and Natalie inside and making Nunez "desperate." Maria thus asserted the deputies, at Reyes's direction, breached a duty they owed Natalie. And because the officers are County employees, Maria alleged the County is liable for their "neglect of duty."

Maria also alleged in her third cause of action that she and Robledo developed a "special relationship" with Curry and Martinez. Maria claimed that the deputies "assumed a greater duty than that was generally owed to the public" by making promises to Maria and Robledo, but they breached that duty by failing to enter Nunez's apartment while remaining on the premises.

Defendants moved for summary judgment on Maria's third and only remaining cause of action for neglect of duty. The trial court granted the motion and entered judgment for defendants. Maria timely appealed.

III.

DISCUSSION

Maria contends the trial court erroneously granted defendants' motion for summary judgment. We disagree.

A. *Summary Judgment Principles and Standard of Review*

"A party moving for summary judgment bears the burden of persuasion there is no triable issue of material fact and is entitled to judgment as a matter of law. A defendant satisfies this burden by showing one or more elements of the cause of action in question cannot be established or there is a complete defense to that cause of action. If the defendant meets this initial burden, the opposing party must then make a prima facie showing of the existence of a triable issue of material fact. [Citation.] [¶] We review the denial of a motion for summary judgment de novo. [Citation.] We strictly construe the moving party's affidavits and liberally construe the opposing party's affidavits. We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. (*City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 25.)

Thus, "[w]hen deciding whether to grant summary judgment, the court must consider all of the evidence set forth in the papers (except evidence to which the court has sustained an objection), as well as all reasonable inferences that may be drawn from that evidence, in the light most favorable to the party opposing summary judgment." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467.)

8

B. *Evidentiary Issues*

In granting summary judgment, the trial court overruled 10 of Maria's objections while sustaining all of defendants' objections.[2] Although Maria acknowledges these rulings in her opening brief, she provides no argument as to why they were incorrect. By failing to challenge the trial court's rulings on the objections, she has forfeited any argument that the rulings were incorrect. (See *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

We therefore do not consider Maria's evidence that the trial court excluded by sustaining defendants' objections. (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1196.) We also decline to address Maria's arguments on the objections raised for the first time on appeal. (See *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 454.)

C. *Analysis*

To succeed on her neglect of duty claim, Maria had to show that defendants owed her a duty of care. Maria argues that the deputies should have (1) entered Nunez's apartment sooner, (2) left the premises in order to deescalate the situation, (3) checked if Nunez had a warrant out for his arrest, (4) allowed the property manager to enter the apartment based on a provision in Nunez's lease that allowed him to enter for emergencies, and/or (5) applied for a search warrant of Nunez's apartment. She claims

---

[2] The trial court declined to rule on the first 18 of Maria's objections because they concerned her first two causes of action, which defendants unnecessarily addressed in their motion for summary judgment because they forgot the trial court had sustained their demurrer to those causes of action without leave to amend.

9

that the deputies "owed a duty of care to perform at least one of the[se] reasonable options available to them" and breached that duty by failing to perform them.

Maria's third, fourth, and fifth contentions are not alleged anywhere in the SAC. Nothing in Maria's third cause of action suggests that she believed the deputies were negligent because they did not check if Nunez had an arrest warrant, did not allow the property manager to enter Nunez's apartment, and did not apply for a search warrant for his apartment.

Rather, Maria alleged in her operative SAC that Curry and Martinez's "negligent performance of their duty consists of staying around [the apartment] but neither entering the residence nor leaving the property, which operated to confine" Nunez and Bazan in the apartment, which drove Nunez desperate. Reyes's alleged negligence was directing Curry and Martinez "not to enter the apartment, but [to] remain on the scene." Reyes also negligently failed to correctly instruct the deputies on when they may enter a residence without a warrant due to exigent circumstances. According to Maria, the circumstances at Nunez's apartment "were sufficient for the warrantless entry into . . . [the] apartment" and thus the officers were negligent for refusing to enter.

The third cause of action goes on to repeatedly allege that the deputies' "affirmative acts of staying around" and their "extended presence near" the apartment increased Natalie's risk of harm. Maria then claims that Natalie's murder "could have been avoided had [the deputies] acted quickly to enter or leave [] Nunez's apartment before [he] grew desperate." Again, Maria alleges that Curry and Martinez's "negligent

10

performance of their duty consists of staying around but neither entering the residence nor leaving the property."

In short, Maria did not allege in her third cause of action that the deputies should have checked if Nunez had a warrant out for his arrest, allowed the property manager to enter, or applied for a search warrant for his apartment. Instead, the claim is based entirely on Maria's allegation that the deputies were negligent because they did not enter Nunez's apartment, but instead "stay[ed] around" the premises, thereby preventing Maria and Robledo from entering. We therefore do not consider Maria's contentions that the deputies were negligent because they failed to verify whether Nunez had an arrest warrant, precluded the property manager from entering Nunez's apartment,[3] and failed to apply for a search warrant for his apartment.[4] (See *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444 [considering theory of negligence alleged in complaint only and declining to address "unpled theory of liability"].) We will consider only Maria's allegations in the SAC that the deputies had a duty to enter Nunez's apartment or leave the premises.

---

[3] Regardless, the trial court sustained defendants' objections to the hearsay evidence Maria relies on to support her contention that the property manager told Curry and Martinez that he could lawfully enter Nunez's apartment under the terms of his lease. Maria does not challenge that ruling on appeal, so there is no competent evidence in the record supporting her argument that the property manager could have lawfully entered Nunez's apartment pursuant to his lease agreement.

[4] In any event, as defendants correctly observe, there was no outstanding warrant for Nunez's arrest. Although there was a request for an arrest warrant for his failure to appear at a hearing on a fare evasion citation, there is no evidence that a warrant was ever issued.

Defendants contend that, even if they were negligent for refusing to enter Nunez's apartment and staying on the premises, they are immune from liability under Government Code section 820.2[5] (section 820.2.). We agree.

Section 820.2 reads in full: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

Discretionary decisions that are the result of "'personal deliberation, decision and judgment'" generally are entitled to immunity under section 820.2. (*McCorkle v. City of Los Angeles* (1969) 70 Cal.2d 252, 261-262 (*McCorkle*).) Section 820.2 immunity thus applies only to "*deliberate and considered* policy decisions, in which a '[conscious] balancing [of] risks and advantages . . . took place.'" (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 981.)

"Discretionary immunity under section 820.2 has been found to apply to many areas of police work." (*Conway v. County of Tuolumne* (2014) 231 Cal.App.4th 1005, 1015 (*Conway*).) Law enforcement's discretionary decisions that have received section 820.2 immunity include the decision to pursue a fleeing vehicle, the decision to

---

[5] Maria argues at length that she had a "special relationship" with Curry and Martinez because of the statements they made at the scene. We need not decide the issue because we conclude defendants are immune from negligence liability, whatever the source of any duty they owed Maria.

12

investigate an accident or not, the decision not to make an arrest, and the decision whether to use official law enforcement authority to resolve a dispute. (*Ibid*.)

Law enforcement is not immune under section 820.2, however, for conduct that is merely "ministerial."[6] (*Conway*, *supra*, 231 Cal.App.4th at p. 1015.) An act is ministerial if it amounts "'only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own.'" (*McCorkle*, *supra*, 70 Cal.2d at pp. 261-262.) Ministerial acts thus "merely implement a basic policy already formulated." (*Caldwell v. Montoya*, *supra*, 10 Cal.4th at p. 981; see also *Center for Biological Diversity v. Department of Forestry & Fire Protection* (2014) 232 Cal.App.4th 931, 952 ["'A ministerial duty is an obligation to perform a specific act in a manner prescribed by law whenever a given state of facts exists, without regard to any personal judgment as to the propriety of the act.'"].)

Defendants rely primarily on three cases in which law enforcement's actions were held to be discretionary decisions entitled to section 820.2 immunity while Maria relies mostly on two cases finding officers were not entitled to immunity. We find defendants' authority more applicable here.

The plaintiffs in *Michenfelder v. City of Torrance* (1972) 28 Cal.App.3d 202 (*Michenfelder*) alleged police officers failed "to take appropriate action to protect" the plaintiffs' property. The plaintiffs operated a shop on leased property under a franchise

---

[6] Law enforcement may not be immune under section 820.2 if "public policy dictates against immunity." (*Conway*, *supra*, 231 Cal.App.4th at p. 1015.) Although Maria acknowledges this principle, she does not argue it applies here.

agreement, but the franchisor and other defendants entered the shop, removed a window, changed the locks, and got rid of the plaintiffs' goods.  (*Id*. at p. 203.)  The plaintiffs alleged city policy knew about the incident, investigated the scene, yet did nothing and did not notify the plaintiffs of what had happened.  (*Id*. at p. 204.)

The *Michenfelder* court held the officers were immune from the plaintiffs' negligence suit under section 820.2 because their decision not to act was discretionary. The court rejected the plaintiffs' argument that "once a city has decided to employ police and send them to the scene of an occurrence, the action of the officers there is ministerial." (*Michenfelda*, *supra*, 28 Cal.App.3d at p. 207.)  The *Michenfelder* court held that the officers' decision to act (or not) and to use their "official authority on any particular occasion is peculiarly a matter of judgment and discretion."  (*Id*. at p. 206.) The officers' failure to act while the defendants trespassed on and damaged the plaintiffs' property was a discretionary decision because the officers "were obliged to exercise their own discretion after they had observed what was happening and had listened to the explanation of the persons present."  (*Ibid*.)

In *Watts v. County of Sacramento* (1982) 136 Cal.App.3d 232 (*Watts*), police officers decided to intervene and resolve a land dispute between the plaintiffs and a landowner by ordering the plaintiffs off the land.  The Court of Appeal held the officers' conduct was discretionary under section 820.2 because, like the officers in *Michenfelder*, "the officers were obliged to exercise their discretion after they had observed what was

14

happening and had listened to the explanation of those present" to settle the dispute. (*Watts*, *supra*, at p. 235.)

The third case defendants mostly rely on is *Conway*, *supra*, 231 Cal.App.4th 1005. There, the defendant-officers used tear gas to carry out an arrest. (*Id*. at p. 1018.) The *Conway* court held they were entitled to section 820.2 immunity because once they decided to arrest the suspect, "they were vested . . . with discretion to determine the means by which the arrest should be carried out." (*Id*. at p. 1018.) The officers used that discretion "by observ[ing] and listening" the premises before making the decision to use tear gas. (*Ibid*.) This decision required "'comparisons, choices, judgments, and evaluations,'" which "'comprise[] the very essence of the exercise of 'discretion.'" (*Ibid*.)

Maria, on the other hand, relies mostly on *McCorkle*, *supra*, 70 Cal.2d 252, and *Carpenter v. City of Los Angeles* (1991) 230 Cal.App.3d 923 (*Carpenter*). Both are distinguishable.

In *McCorkle*, a police officer was summoned to a car accident scene. *McCorkle*, *supra*, 70 Cal.2d at p. 259.) When he arrived, he spoke with the plaintiff, who was involved in the accident, while standing on the corner of the intersection. (*Ibid*.) Then, without taking any precautions, the officer walked into the intersection with the plaintiff and told the plaintiff to show him the skid marks. (*Ibid*.) While doing so, she was hit by a car. (*Ibid*.)

The *McCorkle* court held that the officer's acts were ministerial because "asking the plaintiff . . . to come into the intersection involved no [] deliberation, decision, or judgment." (*Conway*, *supra*, 231 Cal.App.4th at p. 1019.) Rather, the officer, who had investigated "'a few hundred'" accidents, was only implementing established policy, which directed him to ask the plaintiff to walk into the intersection. (*McCorkle*, *supra*, 70 Cal.2d at p. 262.) This ministerial act of following routine, established policy as part of his investigation caused the plaintiff's injury, not the officer's exercise of his "discretion, if any." (*Ibid*.) The officer therefore was not entitled to section 820.2 immunity. (*Ibid*.)

*Carpenter* involved the police's duty to warn a witness that his life was in danger. After the plaintiff was robbed at gunpoint, he gave a description of the assailant to Detective Williams and identified the defendant (Jenkins) during a preliminary hearing as his assailant. (*Carpenter*, *supra*, 230 Cal.App.3d at p. 927.) Jenkins approached the plaintiff after the hearing and made threatening comments. (*Ibid*.) The plaintiff asked Williams about Jenkins's criminal history and whether he should be concerned for his safety. (*Ibid*.) Williams told the plaintiff "that he did not have anything to worry about, that Jenkins was 'a street punk' who was 'basically into' grand theft auto and small robberies." (*Ibid*.) About two months later, the plaintiff was shot several times by an unknown assailant. (*Ibid*.)

The plaintiff sued the City of Los Angeles, which argued it was immune under section 820.2. (*Carpenter*, *supra*, 230 Cal.App.3d at p. 935.) The City focused on Williams's "statement to [the plaintiff] regarding the danger, or lack thereof, posed by Jenkins," and argued that "Williams exercised his discretion when he determined exactly how much to tell appellant about Jenkins." (*Ibid*.) The *Carpenter* court held that Williams's "choice . . . , if any" of what to tell the plaintiff about Jenkins was not a "'basic policy decision" entitled to immunity. (*Ibid*.)

This case falls more in line with *Michenfelder*, *Watts*, and *Conway* than *McCorkle* and *Carpenter*. In both *McCorkle* and *Carpenter*, the officers were not entitled to immunity because their challenged acts did not involve an actual exercise of discretion that reflected a conscious balancing of risks and advantages. (*Caldwell v. Montoya*, *supra*, 10 Cal.4th at p. 981.) There was no indication the officer in *McCorkle* deliberated before walking into the intersection with the plaintiff without imposing any safety precautions. The detective's choice, "if any," about what to tell the *Carpenter* plaintiff about his assailant did not reflect a conscious, deliberate weighing of risks and benefits. (*Caldwell v. Montoya*, *supra*, 10 Cal.4th at p. 981.) It was not a "basic policy decision" subject to the detective's exercise of his discretion. (*Ibid*.)

By contrast, the officers in *Michelfelder*, *Watts*, and *Conway* exercised considerable discretion in acting (or not acting) in the way they did. In all three cases, the officers made their challenged decisions after investigating, speaking with potential witnesses and interested parties, evaluating the situation, and then acting (or not). To

17

make these decisions, the officers did not have to "merely implement a basic policy already established" because they were "left with no choice" but to apply the policy to the facts at hand. Instead, their decisions required them to gather facts, evaluate their options, and then proceed according to their professional judgment.

The same is true here. Maria emphasizes that what the officers knew about the situation showed that there were exigent circumstances. She notes that the officers were told that Maria, Velasquez, and Robledo were concerned Nunez had hurt Natalie. She notes that the officers were made aware of Nunez's past instances of domestic violence, Natalie's request for a DVRO, the unusual Snapchat message sent from Natalie's account, that Maria thought she heard someone inside (while the officers did not hear anything), and the fact that Natalie's phone had been off for several hours but was last located about a mile away from Nunez's apartment.

Defendants, for their part, contend there was no exigency until Nunez opened the door. They emphasize that Curry and Martinez did not hear anything in Nunez's apartment for except for an air conditioner running, despite knocking repeatedly and listening to the apartment from both sides. Defendants note that Curry and Martinez continuously evaluated the situation with Reyes, who concurred there still were no grounds for warrantless entry based on his evaluation of the facts as reported to him. As defendants repeatedly highlight, no one knew whether Nunez or Natalie was inside the apartment.

18

The evidence the parties respectively emphasize shows that the officers had to consider a variety of facts in deciding what to do. During their hours-long investigation, Curry, Martinez, and Reyes spoke with multiple witnesses, used their senses to evaluate the scene, and used their professional judgment on how to investigate the situation and for how long to do so. Like the officers in *Michelfelder*, *Watts*, and *Conway*, Curry, Martinez, and Reyes exercised considerable discretion by making a series of decisions on how to best proceed based on the information they learned and what they perceived at the scene. Even if some facts suggested Natalie could be in danger inside Nunez's apartment, the lack of any sounds coming from the apartment other than the air conditioning and the deputies' repeated unanswered knocks suggested that no one was inside the apartment. The deputies were required to use "'personal deliberation, decision, and judgment'" in determining whether to enter Nunez's apartment, leave, or conduct further investigation. (*McCorkle*, *supra*, 70 Cal.2d at pp. 260-261.)

Ultimately, Curry, Martinez, and Reyes made a deliberate and considered decision together not to enter Nunez's apartment after remaining on the scene for several hours to investigate by various means. These discretionary decisions are entitled to immunity under section 820.2. As a result, defendants are immune from liability under section 820.2 for Maria's third cause of action. And because they are immune, so is the County. (Gov. Code, § 815.2, subd. (b); *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 504, 509.) We therefore affirm the trial court's grant of summary judgment to defendants.

## IV.

## DISPOSITION

The judgment is affirmed.  Defendants may recover their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.